UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CALVIN STUART, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>FS KKR CAPITAL CORP., et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. Action No. 2:26-cv-02969-CFK<br><br>CLASS ACTION<br><br>CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

Page

I. NATURE OF THE ACTION AND OVERVIEW ..... 1

II. JURISDICTION AND VENUE ..... 9

III. PARTIES ..... 10

IV. DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF BUSINESS ..... 13

A. Defendants Presented Paper Restructurings as Genuine Recoveries ..... 15

B. KKR and the Adviser Controlled the Process and Profited from Delayed Loss Recognition ..... 17

C. As Credit Problems Spread, Defendants Called Them Isolated ..... 22

D. By May 2025, Defendants Continued to Sell Stability as the Portfolio Deteriorated ..... 24

E. August 2025: Defendants Could No Longer Postpone the Reckoning While the Adviser Continued Collecting Fees ..... 25

F. November 2025: Defendants Used the PRG Restructuring to Claim Credit Was Improving While Five Other Borrowers Were Deteriorating ..... 29

G. February 2026: The Concealed Pattern and Its Consequences Came into View ..... 34

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 38

A. Defendants Misrepresented the Condition and Credit Quality of FSK's Portfolio ..... 39

B. Defendants Used Restructurings and Security-Level Nonaccrual Classifications to Misrepresent Borrower-Level Improvement ..... 48

C. Defendants Misrepresented FSK's Current Investment Ratings, Accrual Classifications, and Fair Values ..... 57

D. Defendants Misrepresented Whether the Adviser's Compensation Conflict Had Materialized ..... 63

E. Defendants Misrepresented the Durability of FSK's Reported Earnings and the Basis for FSK's Distribution Guidance ..... 67

F. Defendants Misrepresented FSK's Investment Values, NAV, NII, and Related Financial Results ..... 73

**Page**


VI. LOSS CAUSATION ........ 80

VII. CLASS ACTION ALLEGATIONS ........ 84

VIII. FRAUD ON THE MARKET ........ 86

IX. CLAIMS FOR RELIEF ........ 88

X. PRAYER FOR RELIEF ........ 94

XI. JURY DEMAND ........ 94

Lead Plaintiff Morris Propp, Individually and on behalf of Marni & Morris Propp II Family Foundation Inc., Mortimer J. and Eugenie Alter Propp Fund Inc., Morris & Anna Propp Sons' Fund Inc., and Propp Heller Family L.P. ("Lead Plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by FS KKR Capital Corp. ("FSK" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of all persons who purchased or otherwise acquired the common stock of FSK between May 8, 2024 and February 25, 2026, inclusive (the "Class Period"). Plaintiff asserts claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 against: (i) FSK; (ii) its external investment adviser, FS/KKR Advisor, LLC ("FS/KKR" or the "Adviser"); (iii) Franklin Square Holdings, L.P. (" FS Investments"), KKR Credit Advisors (US) LLC ("KKR Credit"), and KKR & Co. Inc ("KKR"); and (iv) certain FSK officers.

2. At its heart, this case is about KKR – one of the world's largest alternative asset managers – and its affiliates defrauding FSK's stockholders to protect an extremely lucrative fee stream. KKR used FSK – a publicly traded business development company ("BDC") that principally lends to and invests in private companies – as a captive pool of public capital to finance and hold loans originated and managed through KKR's private-credit platform, generate hundreds of millions of dollars of fees for itself, and shift the attendant credit risk to FSK's shareholders while concealing how badly the loans had deteriorated. When borrowers weakened, Defendants (defined

below) kept substantial portions of their debt classified as performing and on accrual, recognized interest the borrowers never paid in cash, and carried investments above fair value. That misconduct delayed recognition of FSK's losses, inflated its reported asset values and income, preserved the Adviser's compensation, and left FSK's shareholders holding the bag when the truth could no longer be concealed.

3. Throughout the Class Period, Defendants told FSK's stockholders that KKR could be trusted to deploy its vast resources and credit expertise for their benefit – not to use FSK to advance KKR's own financial interests at their expense. FSK promoted its access to approximately 170 KKR Credit investment professionals and more than 710 investment professionals across KKR as a "significant competitive advantage." It told investors that the Adviser maintained a "high bar on credit quality," and followed a "disciplined underwriting process." KKR likewise called alignment with fund investors one of its "fundamental investment philosophies," while co-founder Henry Kravis declared that KKR's "business really runs on trust." Defendants thus placed KKR's reputation behind FSK's underwriting, monitoring, valuation, and reporting.

4. That reliance was critically important because FSK had no employees of its own. Rather, FSK depended on KKR and the Adviser to evaluate, negotiate, structure, execute, monitor, and service its investments. KKR and the Adviser received borrowers' nonpublic financial and operating information, maintained watchlists, assigned internal risk ratings, and directed workouts of troubled loans; the Adviser also determined whether loans would remain on accrual and served as FSK's valuation designee, with responsibility for determining fair value each quarter. KKR Credit jointly operated the Adviser and appointed four members of its eight-member Investment Committee. Michael Forman ("Forman") held senior leadership positions at FSK, the Adviser, and FS Investments, while Daniel Pietrzak ("Piertrzak") served as FSK's President, Chief Investment Officer, and a director and was also a Member of KKR Credit and KKR's Global Head of Private

Credit. At year-end 2024, approximately $12.0 billion of FSK's $13.5 billion investment portfolio – about 89% – consisted of Level 3 investments, meaning their values depended on significant unobservable inputs rather than quoted market prices.

5. Those judgments determined whether FSK would report a loan as healthy, recognize its interest as income, and carry it at a stated value. Fair value purported to represent the price FSK could obtain in an orderly transaction with market participants. A loan left on accrual continued to generate reported interest income, whereas a loan was supposed to be placed on nonaccrual when there was reasonable doubt that its interest would be collected. FSK also recorded payment-in-kind ("PIK") interest as current income even though the borrower paid no cash and instead added the interest to its debt.[1] These determinations drove FSK's net asset value ("NAV"), net investment income ("NII"), reported nonaccrual rate, and distributions – the principal measures investors used to assess FSK's value and performance.

6. Because the Adviser's compensation depended on those determinations, the fee structure put its duties to FSK in potential conflict with its own financial interests. The Adviser's management fee increased with the size of FSK's reported assets, while its incentive fee increased with FSK's reported income. The Adviser therefore stood to collect more money by keeping troubled loans at higher values and continuing to recognize interest – including PIK interest that

---

[1] Unlike cash interest, PIK interest is not paid when it accrues. The borrower instead adds the interest to its outstanding debt, while FSK records the noncash amount as current income. PIK can therefore increase FSK's reported income and the borrower's debt even though FSK receives no corresponding cash. Particularly when introduced or increased during a restructuring, PIK allows a borrower under cash-flow pressure to defer interest and increase the principal ultimately due, potentially postponing recognition of losses while FSK immediately reports the noncash amount as income. *See International Monetary Fund, Global Financial Stability Report: The Rise and Risks of Private Credit* 59-60 (Apr. 2024) (explaining that rising interest burdens had prompted private-credit borrowers to resort to PIK and warning that the resulting flexibility could produce "compounding losses" if the borrower's underperformance continued); *Federal Deposit Insurance Corporation, 2025 Risk Review 27* (May 2025) (identifying increased PIK income among BDCs as a sign that borrowers may be experiencing liquidity constraints).

borrowers had not paid in cash. Moreover, investment losses did not reduce the income-based fee, and later markdowns did not require the Adviser to return fees attributable to income FSK ultimately failed to collect. The Adviser therefore stood on both sides of the decisive judgments: it determined the values and income used to calculate its own compensation, collected current fees based on those determinations, and left FSK's stockholders to absorb the losses when the marks and reported income could no longer be sustained. Defendants, nevertheless, denied that this structure was adversely affecting FSK.

7. Preserving this fee stream was critical to KKR, which stated that FSK was the primary source of recurring fee-related performance revenues in its Credit and Liquid Strategies business. At KKR's April 2024 Investor Day, CFO Robert Lewin identified FSK as a transaction KKR had used to "de-risk the firm," called FSK "as close to permanent capital as you get in our industry," and explained that long-duration capital "drives management fee visibility and stability." During 2024 and 2025 alone, FSK incurred approximately $725 million in base-management and income-incentive fees payable to the Adviser, in whose economics KKR shared through KKR Credit. Preserving that lucrative revenue stream provided a profound motive for fraud.

8. And Defendants sought to protect that fee stream at all costs, including by using restructurings,[2] tranching,[3] and PIK to disguise credit deterioration as progress. Quarter after quarter, they claimed that 93% to 95% of FSK's investments were performing, dismissed mounting credit problems as isolated or company-specific, and portrayed investments originated by KKR

---

[2] As used here, a restructuring changes the terms or form of a troubled investment – for example, by extending its maturity, changing its interest terms, exchanging existing debt for new debt or equity, or transferring ownership to the lenders. A restructuring may change how an investment is reported without repaying FSK's capital or curing the borrower's underlying inability to generate cash.

3 Tranching divides a single credit exposure into separate instruments, or tranches, with different payment and recovery priorities. It can permit the junior tranche to be placed on nonaccrual while the senior tranche remains on accrual, even though both depend on the same borrower and collateral.

Credit and the current Adviser (the "current-Adviser portfolio") as materially stronger than FSK's older "legacy" investments. They described restructurings as successful de-risking even when FSK exchanged distressed debt for new debt and equity, removed the old instrument from nonaccrual, and remained exposed to the same borrower without a comparable cash recovery. They placed junior tranches on nonaccrual while continuing to recognize income and value on senior tranches dependent on the same distressed business. And they continued to record PIK as current income on troubled investments even though that interest generated no cash and increased the borrowers' debt. Lead Plaintiff alleges that the reported values exceeded fair value and FSK's resulting NAV and income were materially overstated. The performance, rating, and nonaccrual figures were likewise misleading, even where mathematically derived from Defendants' own classifications, because Defendants presented them as proof that the portfolio was healthy while withholding contemporaneous facts showing otherwise.

9. FSK's approximately $366 million investment in Kellermeyer Bergensons Services ("KBS") provides an example of how the scheme worked. KBS was a KKR-originated borrower, not a legacy investment. Defendants admitted that higher interest expense, wage pressure, and customer losses had caused "material deterioration" at KBS. FSK, nevertheless, split its first-lien exposure between a senior first-out loan[4] and a more junior second-out loan,[5] placing only the second-out loan on nonaccrual. A Wells Fargo analyst immediately identified the potential conflict: carving out an accruing piece allowed FSK to "run interest income through" and appeared to be

---

[4] First-out debt has contractual priority over second-out debt in receiving principal payments and proceeds from collateral or other recoveries. That priority reduces its relative risk but does not guarantee repayment or make it independent of the borrower's financial condition.

[5] Second-out debt is junior to first-out debt in the agreed payment and recovery waterfall. Although both tranches may be secured by the same collateral and described as first-lien debt, the second-out tranche absorbs losses first; both remain obligations of the same borrower and depend on the same business and assets.

"further super prioritizing" the Adviser's performance fee over stockholder recovery. Yet Pietrzak ***rejected*** that concern and said the KBS loan had in fact been "right-sized." FSK and other lenders then exchanged the troubled debt for new first-out and second-out loans and preferred equity, extended the maturity, and took control of KBS; KKR-managed funds obtained approximately 46% of the company. The transaction removed approximately $197.6 million of cost and $135.3 million of fair value from FSK's reported nonaccruals without a comparable cash repayment. KKR Managing Director Lauren Krueger promoted the transaction as positioning KBS for its "next chapter of growth," while FSK cited it as proof of the Adviser's "fundamental derisking approach" and the "benefits of KKR Credit's investment platform."

10. While the restructuring improved FSK's reported nonaccruals, it did not restore KBS's ability to pay cash. By year-end 2024, both replacement loans accrued interest entirely through PIK. The preferred equity that FSK initially carried at a fair value of approximately $48.3 million was valued at zero by June 30, 2025. FSK then placed the smaller second-out loan on nonaccrual and marked it to approximately half of cost but kept the larger first-out loan on accrual, continued recognizing its entirely noncash interest, and valued it above cost.

11. FSK's valuations were also far higher than those assigned by other BDCs to the same or comparable investments. Ares Capital Corporation ("Ares Capital") and BlackRock TCP Capital Corp. ("BlackRock TCP") – independent BDCs that received preferred interests in the same KBS recapitalization – valued those interests at approximately 2.6% and 6.0% of cost, respectively, as of March 31, 2025, and both reduced their marks during the quarter. FSK, by contrast, ***increased*** its KBS preferred-equity mark to approximately 39.8% of cost. The same divergence appeared at Peraton Corporation ("Peraton"), a government-technology contractor. FSK valued its second-lien Peraton loan at approximately 88.1% of principal, while Blue Owl Capital Corporation – another BDC – valued an apparently comparable Peraton second-lien loan having the same maturity and

substantially the same pricing at only approximately 59.1% of principal. These were not marginal differences in judgment: in both instances, FSK assigned a substantially higher value.

12. By the summer of 2025, Defendants' efforts to postpone recognition of FSK's deteriorating loans were beginning to fail. FSK's August 2025 results revealed substantial deterioration in the current-Adviser loans Defendants had repeatedly portrayed as superior. FSK placed selected positions in four borrowers – Production Resource Group ("PRG"), 48Forty Solutions ("48Forty"), KBS, and Worldwise, Inc. ("Worldwise") – on nonaccrual. Those positions had approximately $500 million of cost and only approximately $272 million of reported fair value after purportedly losing approximately $193 million of reported fair value during the quarter. Three of the four were KKR-originated investments, not legacy investments. FSK's overall nonaccrual rate jumped from 3.5% to 5.3% of cost, the current-Adviser nonaccrual rate nearly doubled from 2.0% to 3.8% of cost, and NAV fell 6.2%, from $23.37 to $21.93 per share. Pietrzak admitted that PRG's problems had continued for an "extended period," that KBS's problems had persisted, and that Defendants placed 48Forty on nonaccrual even though it was still paying interest because further deterioration was where the credit was "trending." Defendants nevertheless continued calling the problems company-specific and said they were "not sure there's a theme." FSK's stock fell approximately 8.2% as a result.

13. Defendants responded to the August 2025 disclosures by assuring investors that FSK's credit problems were already being brought under control. On November 6, they used PRG's recent restructuring to support that message. They recalculated FSK's September 30 nonaccrual rates as if the restructuring had already occurred, lowering them from 5.0% of cost and 2.9% of fair value to 3.6% and 1.9%. But the restructuring did not produce a comparable repayment of FSK's invested capital, and Pietrzak admitted that "from a value perspective," FSK was "effectively in the same spot." Defendants nevertheless paired the lower rates with claims of workout progress,

improving current-Adviser credit statistics, better prospects for troubled borrowers, and an approximately $0.55 first-quarter 2026 distribution. But by then, the fourth quarter was more than a month old, and Defendants already knew of deterioration elsewhere in the portfolio that contradicted the assurances they gave to investors.

14. Indeed, two weeks before the call, FSK-controlled lenders had executed an agreement to restructure the debt of Lionbridge Technologies ("Lionbridge"), an FSK borrower that provided language-translation and gaming services. Under the agreement, the lenders would receive equity and FSK would obtain ultimate indirect control of Lionbridge – a lender takeover rather than repayment of the debt in the ordinary course. Yet Defendants kept Lionbridge on accrual at approximately 95% of cost and said nothing about the transaction to investors at that time. FSK's investment in Dental Care Alliance ("DCA"), a dental-services company, had also been marked down for three consecutive quarters, and Pietrzak later admitted that weakness among healthcare rollups had been an "emerging theme" for the "last handful of quarters." Defendants thus selectively used the post-quarter PRG restructuring, which lowered reported nonaccruals, to claim broader portfolio improvement while omitting current information showing deterioration at Lionbridge and DCA.

15. FSK's February 25, 2026 results exposed the deterioration Defendants had omitted in November. FSK placed positions involving five borrowers on nonaccrual during the fourth quarter, including Lionbridge and DCA. Together, those positions represented approximately $255 million of cost and $214 million of reported fair value. PRG came off the list, but the rest of the portfolio did not remain unchanged. Overall nonaccruals rose to 5.5% of cost and 3.4% of fair value – above the September rates and far above the November pro forma figures. Nonaccruals in the current-Adviser portfolio jumped from 3.4% to 5.1% of cost and from 1.8% to 3.1% of fair value, nearly erasing the distinction Defendants had used throughout the Class Period to portray KKR originations

as superior. NAV declined another 5%; Generally Accepted Accounting Principles ("GAAP") and adjusted NII missed Defendants' November guidance; and FSK declared a first-quarter distribution of only $0.48 per share instead of the approximately $0.55 Defendants had led investors to expect. FSK also recorded approximately $47 million of additional losses on PRG after the restructuring Defendants had used to remove it from nonaccrual. Pietrzak then admitted that DCA was a 2021 investment made in "a different rate environment" that was "just over levered."

16. FSK's stock fell approximately 15.2% on February 26, 2026, from $13.32 to $11.29. Yet FSK accrued approximately $78 million in fourth-quarter management and incentive fees for the Adviser – almost exactly the $79 million Defendants had forecast in November – even as FSK lost 5% of its NAV and missed its earnings guidance. For 2025, FSK accrued approximately $342 million in management and incentive fees for the Adviser while reporting only $11 million, or $0.04 per share, in net increase in net assets from operations. The Adviser collected current compensation based on values and income reported before the deterioration was recognized; FSK's stockholders absorbed the markdowns, uncollected income, reduced distribution, and collapse in the stock price. These disclosures removed artificial inflation from FSK's shares. This action seeks to recover for these losses.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC. Jurisdiction is conferred by §27 of the Exchange Act (15 U.S.C. §78aa).

18. Venue is proper pursuant to §27 of the Exchange Act and 28 U.S.C. §§1391(b) and (c) as many of the acts and conduct complained of herein occurred in this District. Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

19. In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III. PARTIES

20. Lead Plaintiff purchased FSK common stock during the Class Period, as set forth in this certification, and was damaged thereby. *See* ECF 15-4.

21. Defendant FS KKR Capital Corp. is a Maryland corporation headquartered in Philadelphia and an externally managed BDC. FSK invests primarily in loans and other securities issued by private U.S. companies. Its common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FSK." Throughout the Class Period, FSK had no employees of its own and relied on the Adviser, personnel supplied by the Adviser, and its affiliates to manage its investments and conduct its day-to-day operations. FSK issued the SEC filings, financial statements, press releases, investor presentations, and other public statements challenged herein.

22. Defendant FS/KKR Advisor, LLC is a Delaware Limited Liability Company headquartered in Philadelphia and registered with the SEC as an investment adviser. Throughout the Class Period, the Adviser served as FSK's external investment adviser, administrator, and valuation designee. The Adviser sourced and underwrote investments, received borrowers' nonpublic financial information, monitored borrower performance, assigned internal risk ratings, managed workouts and restructurings, and implemented FSK's portfolio-valuation process. The Adviser also maintained FSK's financial records, assisted in calculating NAV, and participated in preparing FSK's SEC filings and reports to investors. In return, FSK paid the Adviser a base management fee tied to gross assets and an incentive fee tied to investment income.

23. Defendant Franklin Square Holdings, L.P., did business as FS Investments until July 2025 and thereafter as Future Standard. Through its affiliate FSJV Holdco, LLC, which jointly operated the Adviser with KKR Credit, FS Investments participated in the Adviser's operation. FS Investments also appointed four members of the Adviser's eight-member Investment Committee, supplied personnel who managed FSK and the Adviser, and shared economically in the Adviser's fee income. Defendant Forman simultaneously served as the Chief Executive of FS Investments, FSK, and the Adviser.

24. Defendant KKR Credit Advisors (US) LLC is an SEC-registered investment adviser within the KKR organization and the KKR entity that jointly operated the Adviser. KKR Credit supplied investment professionals, portfolio managers, investment-committee representatives, information systems, monitoring resources, and restructuring personnel used by the Adviser to manage FSK's portfolio. FSK repeatedly attributed its underwriting, monitoring, and workout capabilities – and the supposedly superior performance of investments originated through the current Adviser – to KKR Credit and the broader KKR platform.

25. Defendant KKR & Co. Inc. is a global investment firm and the parent of KKR Credit. Its personnel held senior positions at FSK and sat on the committee responsible for managing FSK's portfolio. During the Class Period, KKR Partner Daniel Pietrzak, KKR's Global Head of Private Credit, served as FSK's Co-President and then President, Chief Investment Officer ("CIO"), and a director; KKR Managing Director Ryan Wilson served as FSK's Co-Chief Operating Officer; and KKR Managing Director and private-credit portfolio manager Rony Ma served as FSK's Vice President. KKR Credit also appointed four of the Adviser's eight Investment Committee members. That committee approved new and follow-on investments, monitored portfolio performance, directed strategic initiatives, and supervised the Adviser's actions on FSK's behalf. Through its ownership interest in the Adviser, its control of KKR Credit, the KKR personnel serving in the overlapping

roles alleged above, and KKR's broader platform, KKR participated in the investment, monitoring, restructuring, and valuation functions at issue and shared in the fees generated by the Adviser's management of FSK.

26. Defendant Michael C. Forman served throughout the Class Period as FSK's Chairman, Chief Executive Officer ("CEO"), and a director. He simultaneously served as Chairman and CEO of the Adviser and as Chairman and CEO of FS Investments. Forman therefore led both FSK, which reported the challenged figures and paid the Adviser's fees, and the Adviser, which received borrowers' nonpublic information, managed troubled investments, implemented FSK's valuation process, and received those fees. Forman signed and certified FSK's periodic SEC filings, led its earnings calls, and personally made statements concerning FSK's credit quality, portfolio stability, workout efforts, nonaccruals, investment income, NAV, and the Adviser's purported success in resolving troubled investments.

27. Defendant Daniel Pietrzak served throughout the Class Period as FSK's CIO and as a director. He served as Co-President until June 2025 and as President thereafter. FSK disclosed that management of its investment portfolio was the responsibility of the Adviser's eight-member Investment Committee and identified Pietrzak as one of KKR Credit's four appointees to that committee. Pietrzak was also a KKR Partner, KKR's Global Head of Private Credit, a portfolio manager for KKR's private-credit funds and portfolios, and a member of KKR's Global Private Credit Investment Committee and KKR Credit Portfolio Management Committee. He oversaw FSK's portfolio and repeatedly spoke to investors concerning borrower performance, internal ratings, nonaccruals, restructurings, portfolio values, and the supposedly superior performance of investments originated through KKR Credit and the Adviser.

28. Defendant Brian Gerson ("Gerson") served as FSK's Co-President during the portion of the Class Period preceding his sudden and unanticipated leave of absence in February 2025, and

his subsequent resignation. During that period, Gerson also served as FS Investments' Head of Private Credit and as a member of the Adviser's investment committee. Gerson made challenged statements concerning FSK's reported nonaccrual rates, the condition and restructuring of KBS, the removal of troubled investments from nonaccrual, and the supposed performance of investments originated by KKR Credit and the Adviser.

29. Defendant Steven C. Lilly ("Lilly") served throughout the Class Period as FSK's Chief Financial Officer ("CFO") and principal financial officer and was also a Managing Director of FS Investments. Lilly oversaw the financial-reporting function through which FSK reported its investment values, accrual classifications, nonaccrual figures, PIK and other investment income, NAV, and Adviser fees. He signed and certified FSK's quarterly and annual reports and personally presented and discussed FSK's investment income, PIK income, NAV, earnings guidance, and distribution coverage on FSK's earnings calls.

30. Forman, Pietrzak, Gerson, and Lilly are referred to collectively herein as the "Individual Defendants."

31. FSK, the Adviser, FS Investments, KKR Credit, KKR, and the Individual Defendants are referred to collectively herein as "Defendants."

## IV. DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF BUSINESS

32. This Action concerns a deceptive course of conduct extending from May 8, 2024 through February 25, 2026, inclusive. Defendants, acting through KKR Credit and the Adviser, used FSK as a captive pool of public capital to finance and hold loans originated and managed substantially through KKR's private-credit platform, protect the lucrative fee stream generated by those assets, and shift the attendant and undisclosed credit risk to FSK's stockholders. During the Class Period, Defendants used FSK's Adviser-controlled valuation, accrual, restructuring, and reporting processes to conceal how badly those loans had deteriorated, keep substantial exposures classified as performing and on accrual, recognize interest borrowers did not pay in cash, and carry

investments above fair value. That conduct delayed recognition of FSK's losses, inflated reported NAV and NII, and preserved the asset and income bases on which the Adviser's fees were calculated.

33. FSK entered the Class Period with a portfolio assembled following an adviser transition and successive mergers. In 2017, FS Investments announced that it would end its existing arrangement with GSO/Blackstone and partner with KKR Credit through the newly formed FS/KKR. FS Investments attributed the change to increasing competition for middle-market loans and represented that the KKR partnership would provide greater scale, stronger origination capabilities, more disciplined risk management, and improved returns.

34. FS/KKR became the investment adviser to certain FS- and KKR-sponsored BDCs in 2018. FSK thereafter acquired Corporate Capital Trust and later absorbed FS KKR Capital Corp. II, leaving FSK with investments originated across several predecessor platforms.

35. When speaking with investors, Defendants divided the resulting portfolio between older investments they labeled "legacy" and investments originated by KKR Credit or the Adviser – the "current-Adviser portfolio." They attributed the supposed superiority of the current-Adviser portfolio to KKR's underwriting, monitoring, and workout capabilities and repeatedly represented that it was materially stronger than the inherited legacy investments.

36. However, by the end of 2023, rising non-accruals were placing that narrative under pressure. FSK's non-accruals had reached 8.9% of portfolio cost and 5.5% of fair value after five investments with an aggregate cost of approximately $654 million were placed on non-accrual during 4Q23. Nevertheless, Defendants emphasized that the current-Adviser portfolio comprised approximately 87% of FSK's investments but accounted for only approximately half of its non-accruals.

37. During 1Q24, Defendants restructured three large troubled investments and removed them from reported non-accruals. Although the restructurings did not produce cash recoveries comparable to the exposures removed from nonaccrual or establish durable operating recoveries, they reduced FSK's reported nonaccruals and enabled Defendants to claim in May 2024 that the investments had returned to performing status and that FSK's "de-risking" efforts had succeeded.

**A. Defendants Presented Paper Restructurings as Genuine Recoveries**

38. The Class Period begins on May 8, 2024, when Defendants announced that FSK had "'made significant progress restructuring certain non-accruing investments.'" The following day, Defendants disclosed that three investments – Wittur Holding GmbH, KBS, and Sweeping Corporation of America – with aggregate cost of approximately $395 million and reported fair value of approximately $224 million had been removed from nonaccrual following restructurings.

39. Under FSK's stated policy, an investment was supposed to be placed on nonaccrual when there was reasonable doubt that its interest would be collected, at which point FSK stopped recording contractual interest as current income. But removing the old investments from nonaccrual did not mean that the borrowers had actually recovered. Rather, portions had been converted into equity, while others had been replaced with newly issued debt. Nevertheless, by treating the replacement debt as accruing, FSK represented that it expected to collect the interest it continued to record.

40. None of the restructurings produced a cash recovery comparable to the exposure removed from nonaccrual or ended FSK's exposure to the affected borrower. Rather, they exchanged distressed instruments for combinations of new debt, equity, and other interests whose value and ability to generate collectible income continued to depend upon the same troubled businesses. FSK's investment schedules show how this process changed the reported treatment of KBS. On December 31, 2023, FSK carried an accruing KBS first-out loan at approximately $160.6

million of amortized cost and $165.7 million of fair value, and a KBS second-out loan on nonaccrual at approximately $197.6 million of amortized cost and $135.3 million of fair value.

41. By March 31, 2024, following what management called KBS's "full consensual restructuring," FSK instead reported two funded replacement loans having aggregate amortized cost of approximately $266.9 million and aggregate fair value of approximately $273.3 million, together with newly received preferred equity carried at approximately $48.3 million. Neither replacement loan was designated as nonaccrual. On May 9, 2024, Gerson confirmed that part of the former nonaccruing loan had been equitized, meaning that FSK and the other lenders had taken control of KBS, that KKR-managed funds owned approximately 46% of the borrower, and that the transaction removed approximately $197.6 million of cost and $135.3 million of fair value from reported nonaccruals. Thus, the entire former nonaccrual position ceased counting even though FSK continued to hold approximately $315.2 million of funded KBS debt, preferred equity at cost, and Defendants disclosed no comparable cash recovery. Wells Fargo quantified the immediate accounting effect: FSK's aggregate KBS debt mark rose from 84% to 102% of cost through what the analyst called a "debt-for-equity swap." Both replacement loans contained substantial PIK components, and by year-end 2024 both were accruing entirely through PIK. The immediate improvement in FSK's nonaccrual statistics therefore resulted from the exchange, equitization, and reclassification of FSK's investment – not the elimination of the underlying KBS credit risk.

42. Based on the restructuring negotiations, their access to borrowers' nonpublic financial information, and their continuing governance and monitoring roles, Defendants knew, or recklessly disregarded, facts showing that the affected borrowers had not achieved the sustainable economic recovery necessary to support Defendants' portrayal of the restructurings and resulting decline in reported nonaccruals as genuine resolution and de-risking. Defendants nevertheless assigned values



4933-1013-3459.v1

to the replacement instruments, treated portions of them as income-producing, and used the resulting decline in reported non-accruals as evidence that FSK had reduced its risk.

43. Those choices directly affected FSK's reported results. Keeping a troubled investment on accrual permitted FSK to record contractual interest as current income, including PIK interest that generated no cash and instead increased the borrower's debt. Dividing a distressed borrower exposure into tranches permitted Defendants to place a junior tranche on nonaccrual while continuing to recognize interest and value on a senior tranche dependent on the same troubled business. Carrying a restructured investment above fair value delayed recognition of depreciation and inflated NAV – the value of FSK's assets after liabilities, expressed per share. The resulting performance, rating, and nonaccrual figures could be mathematically derived from Defendants' own classifications, but still mislead investors because Defendants presented them as proof of economic recovery and a healthy portfolio while withholding contemporaneous borrower-level information showing that the restructurings had not restored sustainable cash performance, that collection of the reported interest remained doubtful, and that FSK still bore substantial underlying risk.

### B. KKR and the Adviser Controlled the Process and Profited from Delayed Loss Recognition

44. The potential fee conflict at the heart of the scheme was embedded in FSK's operating structure. FSK had no employees of its own and paid its executive officers no direct compensation. Instead, the Adviser and its affiliates performed or directed the day-to-day functions at every relevant stage. Adviser personnel selected and underwrote investments, received borrowers' nonpublic financial information, monitored performance, assigned internal risk ratings, maintained watchlists, and directed or participated in restructurings and workouts. The Adviser also served as FSK's valuation designee and administrator, implemented FSK's valuation process, maintained its financial records, assisted in calculating NAV, and participated in preparing the SEC filings and investor reports through which those judgments were presented to investors and the

market. Stockholders' dependence on those judgments was especially consequential because, at year-end 2024, approximately $12.0 billion of FSK's $13.5 billion investment portfolio – about 89% – consisted of Level 3 investments whose values depended on significant unobservable inputs rather than quoted market prices.

45. KKR supplied the people, platform, and authority through which the Adviser performed the functions at issue. KKR Credit jointly operated the Adviser, supplied investment professionals and portfolio managers, and appointed four of the Adviser's eight Investment Committee members. FSK promoted access to KKR's broader platform as a "significant competitive advantage" and described a dedicated portfolio-monitoring unit and restructuring-and-workout team that could draw upon KKR's resources. KKR's role also extended to FSK's investment pipeline. Pietrzak reported that approximately 75% of FSK's new investments in 1Q24 and 70% in 2Q24 were focused on add-on financings to existing portfolio companies and "long-term KKR relationships." Defendants thereby put KKR's name, scale, and reputation behind FSK's underwriting, monitoring, valuations, and workout results. In the case of KBS, for example, Pietrzak specifically told investors that the workout team had brought KKR advisers to bear on the restructuring.

46. Through the Adviser it jointly operated and the personnel it supplied, KKR participated both in managing FSK's loans and in making the reporting judgments that determined when deterioration would appear in FSK's results. Adviser and KKR personnel possessed the borrower information bearing on deterioration and collectability, directed or participated in restructurings, made or participated in accrual and internal-rating determinations, implemented the valuation process, and supplied the executives who presented the resulting figures to investors. The same system that monitored the borrowers therefore also determined whether – and when – their deterioration would be reflected in FSK's results and affect the Adviser's compensation.

47. That system rewarded delay. The Adviser's base management fee was calculated by reference to FSK's gross assets, while its quarterly income incentive fee was calculated from pre-incentive-fee net investment income, including accrued PIK and other noncash income. Under the prior December 20, 2018 Investment Advisory Agreement, between FSK and Adviser, the income incentive fee was subject to a rolling twelve-quarter total-return cap that accounted for pre-incentive-fee net investment income, realized gains and losses, and unrealized appreciation and depreciation. When that cap was zero or negative, no income incentive fee was payable. In June 2021, however, FSK and the Adviser entered into an amended and restated Advisory Agreement that permanently eliminated the lookback. Under the operative agreement, therefore, realized capital losses and unrealized depreciation did not offset the income used to calculate the Adviser's quarterly incentive fee. Delaying a markdown therefore preserved the assets supporting the management fee; keeping a troubled investment on accrual preserved the income supporting the incentive fee.

48. This arrangement was decidedly one-sided. FSK could owe an income incentive fee even when it incurred an overall quarterly loss, and the Adviser had no obligation to reimburse FSK if the income on which the fee was calculated subsequently proved uncollectible. The Adviser was therefore paid currently for maintaining reported assets and recognizing accrued income, while FSK and its shareholders alone bore the risk of subsequent markdown and loss. Indeed, during 2024 and 2025, spanning the eight quarterly reporting periods at issue, FSK incurred approximately $725 million in base-management and income-incentive fees payable to the Adviser, in whose economics KKR shared through KKR Credit. Preserving that stream was critical to KKR, which identified FSK as the primary source of recurring fee-related performance revenues in its Credit and Liquid Strategies business. At KKR's April 2024 Investor Day, CFO Robert Lewin identified FSK as a transaction KKR had used to "de-risk the firm," called FSK "as close to permanent capital as you get in our industry," and explained that long-duration capital "drives management fee visibility and

stability." Defendants nevertheless failed to disclose that this structure was actually adversely affecting FSK or its shareholders.[6]

49. FSK's approximately $366 million investment in KBS provides a concrete example of this conflict. Defendants had acknowledged that higher interest expense, wage pressure, and customer losses had caused "material deterioration" at KBS. On March 25, 2024, KBS announced that funds and accounts managed by KKR, Ares Capital, and BlackRock TCP would collectively become its majority equity holders, and Lauren Krueger, promoted the transaction as positioning KBS for its "'next chapter of growth.'" FSK subsequently disclosed that KKR-managed funds owned approximately 46% of KBS and that FSK and the other lenders had taken control of the company.

50. As a result of this transaction, FSK removed approximately $197.6 million of KBS exposure at cost from reported nonaccrual without receiving a comparable cash repayment. By March 31, 2025, both restructured KBS loans were accruing entirely through PIK, allowing FSK to continue reporting substantial asset values and noncash income – and the Adviser to continue collecting fees – even though KBS remained distressed. That same quarter, FSK valued its KBS preferred equity at approximately 39.8% of cost and increased the mark, while Ares Capital and BlackRock TCP valued preferred interests received in the same recapitalization at approximately 2.6% and 6.0% of cost, respectively, and reduced their marks. The purported turnaround then

---

[6] Less than three months after the Class Period ended – and only after FSK disclosed still further portfolio deterioration – Defendants reduced the fee burden they had defended throughout the Class Period. On May 11, 2026, FSK announced that KKR would waive all its share of the subordinated income incentive fee, reducing by 50% the total income incentive fee otherwise payable by FSK for four consecutive quarters. FSK described the waiver as a "strategic value enhancement action" intended to support net investment income and stockholder distributions. FSK recorded an $11 million reduction in expenses from the waiver in 2Q26 alone. The Adviser's belated willingness to surrender a material portion of its compensation, while continuing under the same advisory agreement, reinforces the inference that the full fees Defendants extracted during the Class Period were not commensurate with the value of the Adviser's services, but instead resulted from a conflicted arrangement through which the Adviser enriched itself at FSK's stockholders' expense.

unraveled. By June 30, 2025, FSK had marked the preferred equity received in the restructuring, initially carried at $48.3 million, down to zero and placed the second-out loan, which had an amortized cost of $94.1 million, on nonaccrual, reducing its reported fair value to $47.6 million. By December 31, 2025, FSK had marked the second-out loan down further to $40.3 million, yet kept the larger, entirely PIK first-out loan on accrual and carried it at $220.3 million – above its $217.1 million cost. The restructuring did not eliminate FSK's risk. It allowed the Adviser to continue collecting fees while FSK's preferred equity was wiped out, the second-out loan lost more than half its value, and the larger first-out loan continued generating only noncash interest.

51. An analyst questioned Pietrzak about this conflict in real time, yet he dissembled. On February 27, 2024, Wells Fargo analyst Finian O'Shea observed that FSK's partial-accrual restructurings of KBS and Reliant Rehab appeared to acknowledge that FSK would not recover its original investments while carving out purportedly performing pieces that allowed FSK to continue to "run interest income through." O'Shea stated that the practice could create the impression that the Adviser was "further super prioritizing" its performance fee at the expense of shareholder. Pietrzak – speaking simultaneously as FSK's CIO and a senior KKR private-credit executive – rejected that concern, defended the structures as ordinary workouts, and represented that the KBS loan had been "right-sized.'

52. Defendants then continued the same course of conduct, portrayed the conflict as merely hypothetical, and cited the resulting nonaccrual, income, and valuation figures as proof that the Adviser and KKR were successfully managing and de-risking the portfolio. When the troubled investments deteriorated further, FSK's shareholders absorbed the markdowns and the loss of income FSK never collected, while the Adviser kept the cash fees generated by the very valuations, accrual classifications, and noncash income challenged herein. The scheme thus allowed the

Adviser to extract current cash from FSK – and KKR to share in that cash through KKR Credit – by delaying recognition of losses ultimately borne by FSK's shareholders.

**C. As Credit Problems Spread, Defendants Called Them Isolated**

53. As the year went on, Defendants continued to point to their shrinking non-accruals as evidence that their restructurings and workouts were succeeding. On August 6, 2024, Forman called the second quarter "'another solid quarter'" and stated that the workout team's efforts had "'further reduced our non-accrual investments.'" FSK reported that non-accruals had fallen from 6.5% to 4.3% of the portfolio at cost and from 4.2% to 1.8% at fair value. Pietrzak separately emphasized that, for the 88% of the portfolio originated by KKR Credit and FS/KKR, non-accruals were only 2.4% at cost and 0.6% at fair value. Analysts viewed the lower rate as evidence of real credit improvement. Jefferies called the quarter "clean" and attributed FSK's adjusted-NII beat in part to "lower NPAs[Non-Performing Assets]." J.P. Morgan likewise described an "improvement in FSK's non-accrual rate" and expected it, together with the NII beat, to produce a "modestly positive" reaction in FSK's shares, notwithstanding the quarter's NAV erosion.

54. Yet Defendants' May narrative was already under pressure. KBS – one of the borrowers whose restructuring Defendants had just presented as a success – was one of three principal sources of unrealized depreciation during the quarter. Undeterred, Gerson told investors that Defendants were "pleased with the progress" at KBS and "optimistic about its future prospects." When an analyst asked how those assurances squared with an approximately 50% writedown of FSK's KBS equity, Gerson maintained that Defendants were "bullish" on KBS. That presentation shaped how analysts understood and valued FSK. Truist treated the remaining "older, legacy assets" as the drag on FSK's performance and based its $20 price target on FSK's continued transition to investments originated by FS/KKR. Wells Fargo, although acknowledging that credit had been a headwind in eight of the preceding ten quarters, titled its post-call report "Market Shrugs Off

Credit," maintained an Overweight rating based in part on "likely improvements in credit following several restructured investments," and described FSK's credit performance as "stabilizing."

55. Yet by November, additional borrowers were deteriorating. PRG, Miami Beach Medical Group ("Miami Beach"), and Worldwise had driven further unrealized depreciation during 3Q24. Miami Beach had filed for bankruptcy, and Worldwise was headed toward a restructuring after losing business to lower-cost competitors. Defendants again directed investors to the headline figures. Forman stated that FS/KKR maintained a "high bar on credit quality" and a "disciplined underwriting process," while Pietrzak reported that non-accruals had fallen again, to 3.8% at cost and 1.7% at fair value – and to only 2.2% and 0.5%, respectively, among investments originated by KKR Credit and FS/KKR.

56. Asked about the broader credit outlook, Pietrzak conceded that revenue and Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") growth had slowed, that borrowers' interest-coverage ratios were tighter than management would have liked, and that companies had "not a lot of room to maneuver" when they encountered operating problems. Yet he insisted that the problems were "more idiosyncratic to the particular name than anything that's more widespread."

57. By February 2025, the list had grown again. Two more investments had been added to non-accrual, portions of FSK's investment in Miami Beach had been written off in bankruptcy, and Worldwise had required a restructuring. While the reported non-accrual rate at fair value had increased from 1.7% to 2.2% during 4Q24, Forman described improving "credit quality and overall portfolio stability," as one of FSK's principal accomplishments during 2024, cited a 58% reduction in non-accrual investments over the full year, and assured investors that FSK's portfolio continued to demonstrate "strong credit performance." Pietrzak reinforced that account by reporting non-accrual

rates of only 2.0% at cost and 0.8% at fair value for the portion of the portfolio originated by KKR Credit and FS/KKR.

58. When asked whether concerns were increasing across the portfolio, Pietrzak again characterized the problems as "more idiosyncratic" to particular borrowers. Analysts echoed his statements. In its post-call report, Jefferies stated that the new nonaccruals were "idiosyncratic and not reflective of a broader trend," described the 2.0% and 0.8% nonaccrual rates for what it called the "new advisor" portfolio as "low by industry standards," and titled its report "Steady Execution, Positioned Well for 2025." Thus, throughout the period, Defendants treated each disclosed borrower problem as an exception and pointed to FSK's formal non-accrual classifications as proof that the portfolio remained sound. Analysts credited that account. After the February 2025 earnings call, RBC Capital Markets ("RBC") increased the multiple it applied to FSK's projected NAV from 0.88 to 0.94 and raised its price target from $21 to $22, explaining that the increase was driven in part by "more favorable than previously expected credit performance."

**D. By May 2025, Defendants Continued to Sell Stability as the Portfolio Deteriorated**

59. On May 7 and 8, 2025, Defendants continued to reinforce the account they had given investors since the start of the Class Period. FSK's Form 10-Q classified 93% of the portfolio, measured at fair value, in its two "performing" categories. On the earnings call, Pietrzak reported that non-accruals had declined to 3.5% of cost and 2.1% of fair value and that median interest coverage remained steady at 1.7 times. He again singled out the approximately 90% of FSK's assets originated by KKR Credit and FS/KKR, reporting non-accrual rates of just 2% at cost and 1% at fair value. The figures made FSK's credit problems appear limited and the current Adviser's underwriting sound. Analysts treated the reported decline as evidence that credit was improving. Jefferies titled its May 7, 2025 report "Credit Improves QtQ" and called the second consecutive

quarterly decline in nonaccruals “a positive,” while J.P. Morgan identified the lower nonaccrual rate as a positive factor investors would weigh against any decline in NAV.

60. Defendants paired that credit picture with assurances of stable income. FSK called the quarter a “‘strong start to the year,’” declared another $0.70 distribution, and left its $2.80 full-year distribution guidance in place. Forman told investors that accumulated spillover income would provide “stability and confidence” in FSK’s quarterly distributions regardless of quarter-to-quarter changes in NII.

61. Against that backdrop, Pietrzak dismissed PRG and 48Forty, the quarter’s two largest markdowns, in two sentences. He said PRG “continues to be impacted by certain tour cancellations and margin pressure,” and that 48Forty had been affected by “labor costs and excess inventory.” That was all. Again, the explanations made each markdown sound like a discrete operating setback, not a warning that two sizeable credits faced continuing distress and a material risk of non-accrual.

62. Yet PRG had already required a restructuring in 2020 and, as Defendants would later admit, had been overleveraged even before COVID; Pietrzak later described its problems as “ongoing for some extended period of time.” 48Forty had required a lender-supported recapitalization in November 2024, and by the first quarter of 2025 its principal first-lien position was generating substantially more PIK than cash interest. The Adviser was responsible for monitoring and valuing both investments. Yet when Defendants chose to speak more than five weeks into the second quarter, they omitted to disclosure these material historical facts.

### E. August 2025: Defendants Could No Longer Postpone the Reckoning While the Adviser Continued Collecting Fees

63. By August 2025, Defendants could no longer keep the portfolio’s accumulated deterioration out of FSK’s reported results. For the second quarter, FSK’s NAV fell 6.2%, from $23.37 to $21.93 per share, and the Company recorded net realized and unrealized losses of $1.36 per share. FSK also placed selected positions in four borrowers—PRG, 48Forty, KBS, and

Worldwise – on nonaccrual. Those positions had approximately $500 million of cost and only approximately $272 million of reported fair value after losing approximately $193 million of reported fair value during the quarter.

64. Three of the four – 48Forty, KBS, and Worldwise – were KKR-originated investments in the current-Adviser portfolio, not legacy investments. In the current-Adviser portfolio, reported nonaccruals nearly doubled in a single quarter, from 2.0% to 3.8% of cost and from 1.0% to 2.0% of fair value. KBS and Worldwise had also undergone recent restructurings under the Adviser's supervision, and KBS was among the restructurings Defendants had previously invoked when touting "significant progress," the Adviser's "fundamental derisking approach," and the "benefits of KKR Credit's investment platform."

65. KBS supplied the clearest reversal. Its 2024 restructuring had removed approximately $197.6 million of cost and $135.3 million of fair value from non-accrual. By March 31, 2025, both restructured KBS loans were accruing entirely through PIK. Three months later, FSK marked the preferred equity to zero and reduced the second-out loan to approximately $47.6 million against $94.1 million of cost, placing that loan on non-accrual. Defendants nevertheless left the larger first-out loan on accrual, valued it at approximately $210.7 million against $207.1 million of cost, and continued recognizing its interest entirely through PIK. FSK thus stopped recognizing income on one KBS obligation while continuing to report entirely noncash income on another, larger obligation of the same borrower. On the August 7 call, Pietrzak admitted that KBS's problems had been "going on for a period of time."

66. Worldwise unraveled even faster. After restructuring the borrower during the fourth quarter of 2024, FSK carried Worldwise's principal new loan at approximately par as of March 31, 2025. By June 30, FSK had placed that loan on non-accrual and reduced its value to approximately

$10.3 million against $19.3 million of cost, while marking the related equity to zero. Whatever the restructuring changed on paper, it had not produced a durable recovery.

67. By March 31, 2025, FSK had marked PRG's preferred equity down from approximately $120.7 million at year-end 2023 to $22.3 million, yet continued carrying approximately $420 million of PRG debt on accrual and recognized nearly $12 million of PIK income from PRG during the quarter. Three months later, the preferred equity was worth zero. Defendants then placed only selected last-out positions – approximately $198 million of cost and $122 million of fair value – on nonaccrual, while leaving approximately $235.6 million of other PRG debt on accrual and valuing it at approximately $243.5 million, even though those obligations also remained heavily dependent on PIK. The tranches may have differed in priority, but they remained claims against the same distressed business.

68. 48Forty followed a similar pattern. A lender-supported recapitalization in November 2024 extended the maturity of its principal debt and shifted most of the interest from cash to PIK. The loan's reported value then declined from approximately $148.5 million at year-end 2024 to $135.8 million by March 31, 2025, while its cost increased through additional PIK. During the first quarter alone, it generated approximately $3.8 million of PIK income but only approximately $1 million of cash interest. By June, Defendants had placed approximately $188 million of 48Forty cost on non-accrual at $91.8 million of fair value. Pietrzak later admitted that Defendants placed 48Forty on nonaccrual even though it was still paying interest because further deterioration was where the credit was "trending." In other words, the August classification did not mark the beginning of 48Forty's deterioration. It followed a liquidity-driven recapitalization, a substantial shift to noncash interest, and successive markdowns.

69. These problems did not arise in the weeks after Defendants' May 2025 assurances. Each borrower had already passed through a restructuring, recapitalization, or extended period of

deterioration before the August results. While the mechanics differed by borrower, the result was the same: restructurings and extensions bought time, PIK supported reported income without supplying equivalent cash, and security-level classifications kept portions of troubled borrower exposures outside reported nonaccruals while the associated valuations and accrued income continued to support the Adviser's fees.

70. Nevertheless, Defendants again responded by denying the pattern. Forman attributed the results to "company-specific situations." Pietrzak continued to say that the portfolio "demonstrate[ed] stability," described each situation as unique, and when asked whether the repeated deterioration of restructured borrowers revealed a broader problem, he denied there was a theme.

71. FSK released its 2Q25 results after the market closed on August 6, 2025, and held its earnings call before the market opened the following morning. During the first trading session after those disclosures, FSK's stock fell $1.66 per share, or approximately 8.2%, from $20.24 to $18.58, on unusually heavy trading volume.

72. In a report issued after the earnings release but before the next day's trading, RBC described FSK's results as "weaker than expected" and reported that NAV was nearly 6% below both its estimate and the consensus estimate. After noting that FSK had spent the preceding year reducing reported non-accruals, RBC said it was "surprising to see the trends reversing this quarter." J.P. Morgan had estimated that FSK would report only approximately $9.2 million of net realized and unrealized investment losses. FSK instead reported approximately $371 million – roughly forty times J.P. Morgan's estimate – including $224 million of net unrealized losses driven primarily by the four new nonaccruals.

73. Meanwhile, FSK continued accruing fees payable to the Adviser based on the assets and income Defendants reported. During the first half of 2025, FSK accrued approximately $105 million in management fees and $75 million in income incentive fees for the Adviser, including

approximately $89 million during 2Q25 alone. The realized and unrealized investment losses that reduced NAV did not reduce the Adviser's income-incentive-fee calculation, nor did the write-downs reverse fees accrued while the affected investments remained on FSK's books and, in many instances, on accrual.

### F. November 2025: Defendants Used the PRG Restructuring to Claim Credit Was Improving While Five Other Borrowers Were Deteriorating

74. After the August results exposed deterioration in FSK's portfolio, Defendants used FSK's November 5 results release and November 6 earnings call to reassure investors that they had the problem under control. FSK reported that NAV had edged up from $21.93 to $21.99 per share, that the portfolio had produced $0.19 per share of net realized and unrealized gains, and that no new investments had been placed on nonaccrual. Reported non-accruals declined modestly, from 5.3% to 5.0% of portfolio cost and from 3.0% to 2.9% of fair value.

75. Even that modest decline came through the same restructuring mechanism Defendants had used before. During the quarter, Defendants exchanged New Era Technology's non-accruing first-lien loan for a new accruing first-lien loan and revolver, preferred stock, and common equity. The transaction removed approximately $29 million of cost and $18 million of fair value from reported non-accruals. FSK did not exit the investment or recover that amount in cash. It continued holding replacement debt and equity in the same borrower.

76. On the November 6 call, Defendants surrounded those results with assurances that the portfolio and the workout process were improving. Pietrzak said portfolio interest coverage remained "healthy" at 1.8 times and that the governance and workout team had made "significant progress." He said the October restructuring had placed PRG in a "much better position," that 48Forty's restructuring was progressing, and that KBS was performing "in line with plan" after the workout team had stabilized the business "quite quickly." Defendants again touted the supposedly

stronger current-Adviser portfolio, reporting that its non-accrual rate had declined from 3.8% to 3.4% of cost and from 2.0% to 1.8% of fair value.

77. Defendants then used the post-quarter-end PRG restructuring to present a much larger apparent improvement. On September 30, two PRG loans classified as non-accrual carried approximately $197.7 million of cost and $141.9 million of fair value. Those loans were included in FSK's reported non-accrual rates of 5.0% of cost and 2.9% of fair value. Because the PRG restructuring closed in October, after the quarter ended, Defendants recalculated the September 30 rates as though the restructured PRG loans had already ceased counting as non-accrual while every other investment remained unchanged. On that basis, they said non-accruals "would be" only 3.6% of cost and 1.9% of fair value. That single adjustment made FSK's reported non-accrual problem appear roughly one-third smaller.

78. FSK's year-end investment schedule later showed what remained after the restructuring. FSK still held a new PRG loan with approximately $263.9 million of cost and $273.5 million of fair value that accrued interest entirely through PIK, together with approximately $95.3 million of PRG common stock. Thus, FSK continued to report approximately $368.8 million of PRG exposure at fair value, including $273.5 million of new PIK debt that was not designated as nonaccrual. The pro forma calculation measured the effect of replacing and reclassifying the old PRG loans; it did not measure an equivalent recovery in the underlying investment.

79. Moreover, Defendants pro forma presentation assumed that the rest of the portfolio remained unchanged, despite Defendants' knowledge of significant performance problems with other loans. By November 6, the fourth quarter was already 36 days old, and the Adviser was continuing to receive borrower financial statements, operating results, liquidity information, internal risk ratings, valuation materials, and workout reports reflecting deterioration elsewhere in the portfolio. Defendants nevertheless placed the pro forma numbers alongside claims of significant

workout progress, improving current-Adviser statistics, and better prospects at PRG, 48Forty, and KBS.

80. Lionbridge, a language-translation and gaming-services company, provides a direct example of the adverse current information Defendants omitted from that presentation. As of September 30, 2025, FSK carried its first-lien Lionbridge loan on accrual at approximately $92.7 million of amortized cost and $88.3 million of fair value – approximately 95% of cost, down from approximately 101% only three months earlier – even though the loan was due to mature in December 2025. But by then, lenders majority-owned by FSK had already agreed to restructure Lionbridge's debt. According to a determination later issued by Ireland's Competition and Consumer Protection Commission, on July 24, 2025, Lionbridge's owner entities and KKR Loan Administration Services LLC, acting as agent for lending entities majority-owned by FSK, executed a Sale and Restructuring Committee Side Letter under which the parties agreed to implement a restructuring of Lionbridge's debt.

81. On October 23, 2025 – two weeks before Defendants' November 6 earnings call – the parties entered into a Transaction Steps Agreement providing for 100% of the shares of LBT Midco Inc., Lionbridge's parent, to be transferred to New Lionbridge, LP. The lending entities would receive equity, and FSK would obtain ultimate indirect sole control of Lionbridge through its majority ownership of those lenders. The transaction was a lender takeover rather than repayment of the debt in the ordinary course – *i.e.*, not evidence of an improving credit. Lionbridge would surrender its parent's equity to the lenders rather than repay the existing loan on its original terms, leaving FSK to seek recovery by taking control of the distressed borrower. While the proposed acquisition appeared on an Irish merger docket on October 31, the public notice did not disclose its expected effect on FSK's valuation of the Lionbridge loan, the loan's accrual status, or FSK's reported nonaccrual rate. Defendants likewise did not mention the Lionbridge restructuring in

FSK's November 5 Form 10-Q or November 6 earnings call. At year-end, FSK placed Lionbridge on nonaccrual and reduced its fair value from approximately $88.3 million to $79.0 million. Defendants thus gave effect to PRG's post-quarter restructuring because it made reported nonaccruals look better, while ignoring Lionbridge's post-quarter restructuring even though FSK-controlled lenders had already committed to take control of the distressed company in place of repayment.

82. And Defendants' September 30, 2025 schedules showed that additional credits were already under stress. Gracent LLC's ("Gracent") 12% debt was accruing entirely through PIK, while preferred equity with approximately $8.2 million of cost had been marked to approximately $0.5 million. AmeriVet Veterinary Partner's ("AmeriVet") 11.5% PIK preferred investment was also carried below cost. At year-end, FSK placed Gracent's 12% PIK debt and AmeriVet's 11.5% PIK preferred stock on nonaccrual. Pietrzak later acknowledged that weakness among healthcare rollups had been emerging for the "last handful of quarters." By November 6, the Adviser had thus been tracking that deterioration for months, yet publicly Defendants reported every investment other than PRG as unchanged when presenting their lower pro forma nonaccrual rates to investors.

83. DCA was another material credit Defendants reported as unchanged in November despite mounting evidence of deterioration and virtually no reduction in FSK's exposure. During each of the first three quarters of 2025, FSK marked down the loan, reducing its fair value from approximately $107.3 million at year-end 2024 to $102.9 million at September 30, 2025, while keeping the loan on accrual. At year-end – less than two months after the November 6 call – FSK reported the exposure in two tranches, placed both on nonaccrual, designated both as non-income-producing, and reduced their aggregate fair value to approximately $93.4 million against $106.9 million of cost. The fourth-quarter markdown alone was approximately $9.5 million, even though cost declined by only approximately $0.2 million. Pietrzak later admitted that DCA was a 2021

investment made in "a different rate environment" that was "just over levered," and that weakness among healthcare rollups had been an emerging theme for the "last handful of quarters." The repeated pre-November markdowns, the abrupt year-end change in classification, and Pietrzak's admissions confirm that DCA's deterioration was already developing when Defendants selectively provided their November pro forma calculations while ignoring known problems in the remaining portfolio.[7]

84. The November 2025 effort to restore confidence extended beyond credit statistics. Defendants guided to fourth-quarter GAAP NII of approximately $0.51 per share and adjusted NII of approximately $0.56 per share. Although Defendants' reset the expected 2026 quarterly base distribution from $0.64 to approximately $0.45 per share, they emphasized an expected first-quarter total distribution of approximately $0.55 and an annualized 2026 distribution yield of approximately 10% of NAV. Together with the credit and workout statements, those assurances told investors that FSK's remaining portfolio and income base were stable enough to support the new framework. RBC understood those assurances as a claim of durability. One week after the call, RBC reported that the $0.45 base distribution "seems to have been set to be sustainable in a variety of macro scenarios," and increased its estimate of FSK's total 2026 distributions from $2.08 to $2.11 per share.

85. The year-end results exposed the gap between that presentation and the portfolio. Despite PRG's removal from non-accrual, five other borrowers entered non-accrual during the fourth quarter, representing approximately $255 million of cost and $214 million of fair value. Actual non-accruals ended the year at 5.5% of cost and 3.4% of fair value – above the September rates and far

[7] The February earnings call would later confirm how the November presentation had misled investors. An analyst contrasted the year-end results with the prior quarter's "expectations of decreasing nonaccruals" and referred to the 3.6% and 1.9% figures as Defendants' "pro forma guide."

above the November pro forma figures. PRG itself generated approximately $47 million of additional net losses after the restructuring that had caused it to disappear from the non-accrual calculation.

86. Defendants' continued use of the challenged valuations and accrual classifications preserved a substantial stream of management and incentive fees for the Adviser. FSK accrued approximately $51 million in management fees and $33 million in incentive fees during the third quarter, and Defendants projected approximately $79 million more for the fourth quarter. Defendants' November presentation did more than report a pro forma percentage: it used the PRG restructuring, favorable descriptions of other workouts, and confident earnings and distribution forecasts to portray the credit problems disclosed in August as contained and being resolved, while omitting the deterioration already developing at Lionbridge, DCA, and other borrowers. Yet the Adviser continued receiving cash compensation based on FSK's reported assets and income before the year-end markdowns, nonaccruals, and earnings shortfall exposed that deterioration.

### G. February 2026: The Concealed Pattern and Its Consequences Came into View

87. In February 2026, the preverbal chickens came home to roost. After the market closed on February 25, FSK disclosed that positions involving five borrowers had been placed on non-accrual during the fourth quarter: Alacrity Solutions ("Alacrity"), AmeriVet, DCA, Gracent, and Lionbridge. Together, those newly nonaccruing positions represented approximately $255 million of cost and $214 million of reported fair value.

88. As set forth above, Defendants' November pro forma rates had rested on a one-sided assumption: PRG was removed from nonaccrual while every other investment was held unchanged. By year-end, PRG had come off nonaccrual, but positions involving five other borrowers had been added. FSK's overall nonaccrual rate therefore increased to 5.5% of cost and 3.4% of fair value – above the September rates of 5.0% and 2.9% and far above the 3.6% and 1.9% pro forma figures

Defendants had emphasized in November. The results also contradicted Defendants' repeated claim that the current-Adviser portfolio was materially stronger. Its nonaccrual rates jumped in one quarter from 3.4% to 5.1% of cost and from 1.8% to 3.1% of fair value, leaving that supposedly superior portfolio only 0.4 percentage points below FSK's portfolio as a whole by cost and 0.3 percentage points by fair value.

89. Nor were these non-accruals newly emerging issues. Alacrity was a provider of property-and-casualty claims assessment and processing services. In May 2025, Defendants reported that a first-quarter restructuring had removed approximately $22 million of Alacrity debt, with a fair value of approximately $16 million, from nonaccrual. Yet by year-end, Alacrity's distress had reappeared. FSK placed Alacrity's preferred equity, with a cost of approximately $2.3 million and a fair value of only approximately $0.7 million, on nonaccrual and carried approximately $1.9 million of Alacrity common equity at zero. At the same time, approximately $14.4 million of Alacrity first-lien and subordinated debt remained outside reported nonaccruals, including a first-lien loan whose terms included 5.3% PIK. The restructuring therefore had not produced a durable borrower-level recovery. It removed approximately $22 million of distressed debt from reported nonaccruals, only for Alacrity to return through a different security while its larger debt positions remained outside the headline numbers.

90. These newly nonaccruing positions captured only part of the damage. FSK's NAV fell another 5%, from $21.99 to $20.89 per share, including approximately $0.87 per share of investment depreciation. Four other troubled investments – PRG, Medallia, Peraton, and Cubic – accounted for approximately half of the quarter's realized and unrealized losses. And Peraton's distress was not new either. On May 12, 2025, Fitch downgraded Peraton's issuer rating from B to CCC+ and its second-lien loans – the same layer of debt held by FSK – from CCC+ to CCC-. Fitch cited leverage approaching 10x, interest coverage approaching 1x, weaker-than-expected

performance, and negative free cash flow. Against that backdrop, the valuation disparity as of September 30, 2025 was stark: FSK valued its second-lien loan to the government-technology contractor at approximately 88.1% of principal, while Blue Owl Capital Corporation valued an apparently comparable Peraton second-lien loan having the same maturity and substantially the same pricing at only approximately 59.1% of principal. Thus, even the sharply higher non-accrual figures continued to understate the extent of the portfolio's credit deterioration.

91. The income consequences followed. Interest income declined by approximately $29 million from the prior quarter. FSK identified the new non-accruals as one cause of that decline, together with lower base rates and repayments of higher-yielding investments. FSK reported GAAP NII of $0.48 per share and adjusted NII of $0.52, below Defendants' own November guidance of approximately $0.51 and $0.56.

92. The shortfall also reached the distribution Defendants had led investors to expect. Defendants had already announced in November that the 2026 base distribution would be $0.45 per share. But they had estimated that the total first-quarter distribution would be approximately $0.55 and that the 2026 distribution would yield approximately 10% of NAV. In February, FSK declared a total first-quarter distribution of only $0.48 – consisting of the $0.45 base distribution and a supplemental distribution of just $0.03 – and reduced the indicated yield to approximately 9.2%. FSK also guided to adjusted NII of only approximately $0.44 per share for the first quarter, below even the reduced total distribution.

93. The February call exposed both the broader portfolio trend and the borrower-specific facts that Defendants' November presentation had omitted. Two of the five new nonaccruals, AmeriVet and DCA, were healthcare rollups. Pietrzak admitted that weakness among healthcare rollups was an "emerging theme" for the "last handful of quarters." That admission directly contradicted Defendants' August assertion that they were "not sure there's a theme." Addressing

DCA specifically, Pietrzak stated that the investment had been placed on nonaccrual and marked down, that FSK was in "live discussions" with junior debtholders and sponsors, and that DCA was a 2021 investment made in a different interest-rate environment that was "just over levered." Although Pietrzak asserted that DCA's underlying business was operating broadly in line with plan, he identified dental as a "hotspot," and later called DCA and Lionbridge the principal drivers of the quarter's new nonaccruals. Addressing Lionbridge specifically, Pietrzak further admitted that FSK had been engaged in an "active sales process" and that direct AI-related pressure on the business had made that process "hard." These admissions demonstrate that DCA's overleverage and the broader healthcare-rollup weakness did not suddenly arise when the formal nonaccrual designation appeared at year-end. Rather, the Adviser possessed material adverse information while Defendants portrayed FSK's credit problems as isolated and presented the remainder of the portfolio as unchanged. Pietrzak's Lionbridge admission, together with the pre-November restructuring agreements alleged above, likewise corroborated that Lionbridge's deterioration was already material when Defendants' pro forma numbers presented the remainder of FSK's portfolio as unchanged.

94. The market reaction was immediate. FSK released its results after the market closed on February 25 and held its earnings call before the market opened the next morning. On February 26, FSK's stock fell $2.03 per share, or approximately 15.2%, from $13.32 to $11.29, on trading volume of approximately 18.7 million shares – over six times FSK's reported average daily volume.

95. Analysts immediately connected FSK's decline to the newly disclosed credit deterioration and its consequences. RBC called the results "lower than expected," reported that FSK's NAV was 4.4% below its estimate, and attributed part of the earnings shortfall to the increase in non-accruals. RBC's post-call review underscored that the deterioration had spread into the portfolio Defendants had held out as superior, observing that "several of the underperforming portfolio companies were KKR Credit underwritten investments, outside of the legacy portfolio."

Before the market opened, Truist predicted that FSK would underperform its peers because of the 5% NAV decline, the new non-accruals, adjusted NII that fell $0.04 below Defendants' November guidance, and a supplemental distribution of only $0.03 rather than the $0.10 Truist had expected. As the selloff unfolded, Truist reported that FSK's shares were down approximately 15% following results that included "more credit problems," a "5% NAV hit," and first-quarter NII guidance that merely matched the reduced base distribution.

96. The timing and magnitude of the decline, the extraordinary trading volume, FSK's substantial underperformance of the market, and analysts' contemporaneous explanations and revisions support the inference that the February disclosures conveyed material information that had not previously been reflected in FSK's stock price. They further support the inference that the disclosure of FSK's previously concealed credit deterioration and its consequences for NAV, income, and distributions was a substantial cause of the decline. Together, the August 2025 and February 2026 disclosures removed artificial inflation from FSK's shares.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

97. Throughout the Class Period, Defendants portrayed FSK as conservatively managed, with a broadly sound portfolio whose disclosed credit problems were isolated, company-specific exceptions. Defendants used current investment ratings, nonaccrual classifications, fair values, workout outcomes, income measures, and portfolio statistics to support that account. Their statements materially misrepresented or omitted facts concerning: (i) the condition and credit quality of FSK's portfolio; (ii) the success of restructurings and the significance of reported nonaccrual improvement; (iii) the current investment ratings, accrual classifications, and fair values generated through FSK's monitoring and valuation processes; (iv) whether the Adviser's compensation conflict had actually affected its treatment of distressed investments; (v) the quality and durability of FSK's earnings and distributions; and (vi) the resulting investment values, NAV, NII, and financial results.

98. Defendants' forecasts and assurances rested on express representations about conditions then existing in FSK's portfolio, including current ratings, borrower performance, nonaccruals, workout progress, collectability, and the income base supporting distributions. Through the Adviser's monitoring and workout functions, the relevant makers of the statements identified herein received borrower financial statements, liquidity information, internal ratings, valuation materials, and restructuring reports showing that specific large credits had not recovered, remained dependent on PIK, or were moving toward further restructuring and nonaccrual. Defendants nevertheless described those conditions as isolated exceptions or contingent risks and omitted the borrower-level facts that contradicted the account they gave investors. While FSK's public schedules disclosed instrument terms, aggregate PIK income, and the classifications Defendants chose to report, they did not disclose the borrower-specific budgets, cash-flow forecasts, liquidity shortfalls, internal risk assessments, and workout materials showing why those classifications and the assurances built upon them were misleading.

### A. Defendants Misrepresented the Condition and Credit Quality of FSK's Portfolio

99. Defendants repeatedly used FSK's published investment ratings, reported nonaccrual rates, portfolio-wide operating statistics, and current-Adviser results to tell investors that FSK's portfolio remained stable and that its disclosed credit problems were confined to isolated borrowers. Defendants invoked them to claim that credit performance remained strong, investments originated through KKR and the Adviser were performing better, and deterioration had not spread beyond a few company-specific cases.

100. On May 8, 2024, FSK filed its Form 10-Q for the quarter ended March 31, 2024. FSK made the statements in the Form 10-Q, as did Individual Defendants Forman and Lilly who signed and separately certified them. The Form 10-Q stated that the Adviser used a four-level investment-rating system "to characterize and monitor the expected level of returns on each

investment in [FSK's] portfolio." FSK defined a rating of 1 as a "[p]erforming investment" that was "generally executing in accordance with plan" and as to which "there are no concerns about the portfolio company's performance or ability to meet covenant requirements." It defined a rating of 2 as a "[p]erforming investment" as to which there was "no concern about repayment of both interest and our cost basis," although recent performance or industry trends required closer monitoring. Ratings of 3 and 4 denoted underperforming investments for which some loss was possible or concerns existed regarding recoverability.

101. The May 8, 2024 Form 10-Q reported that approximately $10.031 billion, or 71% of the portfolio by fair value, carried a rating of 1, and another $3.334 billion, or 23%, carried a rating of 2. Under FSK's stated definitions, approximately 94% of the portfolio fell within categories FSK labeled performing.

102. On May 9, 2024, FSK held an earnings call concerning its first-quarter results. During the call, Pietrzak stated that FSK "continued to see high single digit EBITDA growth with modest margin pressure" and reported weighted-average year-over-year EBITDA growth of approximately 7%. Gerson reported that investments originated by KKR Credit and the Adviser comprised approximately 88% of FSK's portfolio but had nonaccrual rates of only 2.3% at cost and 1.0% at fair value. Pietrzak reiterated those figures during the question-and-answer portion of the call and told investors that they were "an important fact to understand."

103. On August 6, 2024, FSK filed its Form 10-Q for the quarter ended June 30, 2024, which Forman and Lilly signed and certified. The filing repeated the foregoing investment-rating definitions and reported that approximately $9.989 billion, or 71% of the portfolio, carried a rating of 1, while approximately $3.346 billion, or 23%, carried a rating of 2. Under FSK's stated definitions, approximately 94% of the portfolio fell within categories labeled performing and approximately 6% fell within categories labeled underperforming.

104. On August 7, 2024, during FSK's second-quarter earnings call, Forman stated that FSK continued "to see strong results" among its borrowers and that most companies had adjusted to the higher-rate environment. Pietrzak reported weighted-average year-over-year EBITDA growth of approximately 12% and emphasized that, within the approximately 88% of the portfolio originated by KKR Credit and the Adviser, nonaccruals represented only 2.4% at cost and 0.6% at fair value.

105. On November 6, 2024, FSK filed its Form 10-Q for the quarter ended September 30, 2024, which Forman and Lilly signed and certified. The Form 10-Q repeated FSK's investment-rating definitions and reported that approximately $9.895 billion, or 71% of the portfolio, carried a rating of 1, while approximately $3.393 billion, or 24%, carried a rating of 2. Under FSK's stated definitions, approximately 95% of the portfolio fell within categories labeled performing and approximately 5% fell within categories labeled underperforming.

106. On November 7, 2024, during FSK's third-quarter earnings call, Pietrzak reported weighted-average year-over-year EBITDA growth of approximately 13% and again emphasized the reported condition of the KKR- and Adviser-originated portfolio, stating that nonaccruals represented only 2.2% of its cost and 0.5% of its fair value.

107. When asked about the broader credit outlook during the November 7, 2024 call, Pietrzak assured investors that the issues Defendants had observed were "more idiosyncratic to the particular name than anything that's more widespread."

108. On February 26, 2025, FSK filed its Form 10-K for the year ended December 31, 2024. FSK made the statements in the Form 10-K, as did Forman, Lilly, and Pietrzak, who signed the Form 10-K; Forman and Lilly separately certified it. The Form 10-K repeated the same investment-rating definitions and reported that approximately $9.316 billion, or 69% of the portfolio, carried a rating of 1, while approximately $3.454 billion, or 26%, carried a rating of 2. Under FSK's stated definitions, approximately 95% of the portfolio fell within categories labeled performing.

109. On February 27, 2025, during FSK's fourth-quarter and full-year 2024 earnings call, Forman described improved "credit quality and overall portfolio stability" as the first of four objectives on which FSK had been "highly focused" during 2024. "To that end," Forman cited a 58% reduction in nonaccrual investments during the year. He closed by telling investors, "[o]ur portfolio continues to demonstrate strong credit performance."

110. Pietrzak reinforced those assurances during the same call by reporting weighted-average year-over-year EBITDA growth of approximately 16% and stating that interest coverage had "rebounded" to 1.7 times. Pietrzak further reported that the approximately 89% of FSK's portfolio originated by KKR Credit and the Adviser had nonaccrual rates of only 2.0% at cost and 0.8% at fair value. When asked whether Defendants were observing broader themes among FSK's troubled investments, Pietrzak again stated that the problems were "more idiosyncratic to those specific issuers."

111. On May 7, 2025, FSK filed its Form 10-Q for the quarter ended March 31, 2025, which Forman and Lilly signed and certified. The Form 10-Q repeated the investment-rating definitions alleged above and reported that approximately $9.730 billion, or 69% of the portfolio, carried a rating of 1, while approximately $3.441 billion, or 24%, carried a rating of 2. Under FSK's stated definitions, approximately 93% of the portfolio fell within categories labeled performing and approximately 7% fell within categories labeled underperforming.

112. On May 8, 2025, during FSK's first-quarter earnings call, Pietrzak reported weighted-average year-over-year EBITDA growth of approximately 10% and stated that interest-coverage levels "remain[ed] steady" at 1.7 times. He again emphasized the approximately 90% of FSK's portfolio originated by KKR Credit and the Adviser, reporting nonaccrual rates of only 2.0% at cost and 1.0% at fair value.

113. Pietrzak stated during the May 8, 2025 call that PRG and 48Forty had been FSK's two largest markdowns during the quarter. Pietrzak described PRG's problems as the result of "certain tour cancellations and margin pressure" and 48Forty's problems as the result of "labor costs and excess inventory." Having undertaken to explain FSK's two largest quarterly markdowns, Pietrzak omitted that PRG had been overleveraged and troubled for years and that 48Forty had required a lender-supported recapitalization that shifted most of its interest from cash to PIK – conditions the Adviser was already monitoring when he spoke.

114. On August 6, 2025, FSK filed its Form 10-Q for the quarter ended June 30, 2025, which Forman and Lilly signed and certified. The filing repeated FSK's investment-rating definitions and reported that approximately $9.247 billion, or 68% of the portfolio, carried a rating of 1, while approximately $3.423 billion, or 25%, carried a rating of 2. Under FSK's stated definitions, approximately 93% of the portfolio therefore fell within categories labeled performing.

115. On August 7, 2025, during FSK's second-quarter earnings call, Pietrzak stated to investors that, although nonaccruals had increased, "our portfolio and the private credit market in general both continue to demonstrate stability," and that "each of these situations is unique to the issuer." Forman likewise attributed the quarter's results to "company-specific situations impacting [four] portfolio companies."

116. During the same August 7, 2025 call, Pietrzak reported weighted-average year-over-year EBITDA growth of approximately 8% and stated that "[i]nterest coverage levels remain healthy," with median coverage of 1.8 times. When asked whether investments beyond the four identified borrowers were "bubbling up" on FSK's watchlist, Pietrzak told investors that "the simplest thing" to examine was FSK's published investment ratings and noted that investments assigned ratings of 3 or 4 comprised "roughly 7-odd percent" of the portfolio. While Pietrzak alluded to the higher-rate environment and the impact on government contracts or services as matters

that were "on our mind," those generalized concerns did not identify Lionbridge or disclose that, two weeks earlier, KKR Loan Administration Services had signed a written agreement to restructure Lionbridge's debt on behalf of lenders majority-owned by FSK.

117. On November 5, 2025, FSK filed its Form 10-Q for the quarter ended September 30, 2025, which Forman and Lilly signed and certified. The Form 10-Q again repeated FSK's investment-rating definitions and reported that approximately $8.870 billion, or 66% of the portfolio, carried a rating of 1, while approximately $3.556 billion, or 27%, carried a rating of 2. Under FSK's stated definitions, approximately 93% of the portfolio fell within categories labeled performing.

118. On November 6, 2025, during FSK's third-quarter earnings call, Pietrzak reported weighted-average year-over-year EBITDA growth of approximately 4% and stated that "[i]nterest coverage levels remain healthy," with median coverage of 1.8 times. Pietrzak reported that no new investment had been added to nonaccrual during the quarter and again highlighted the KKR- and Adviser-originated portfolio, stating that its nonaccrual rate had declined to 3.4% at cost and 1.8% at fair value. By pairing the absence of new nonaccruals with "healthy" interest coverage and a declining current-Adviser nonaccrual rate, Pietrzak represented that the deterioration disclosed in August had not spread materially through the balance of FSK's portfolio.

119. Each of the foregoing Forms 10-Q was signed by Forman and Lilly, and the February 26, 2025 Form 10-K was signed by Forman, Lilly, and Pietrzak, among others. Forman and Lilly separately certified that, based on their knowledge, each report contained no materially untrue statement or material omission and that the financial and other information fairly presented FSK's financial condition and results of operations in all material respects. Forman and Lilly also certified that they had designed, or supervised the design of, disclosure controls intended to ensure that material information concerning FSK, including information known to others performing functions

for FSK, was made known to them during preparation of the reports, and that they had evaluated the effectiveness of those controls as of quarter-end.

120. The statements alleged in ¶¶109-110, 112-113, 115-116 and 118 were materially false and misleading when made. Defendants used FSKs investment ratings, nonaccrual figures, current-Adviser statistics, and portfolio-wide averages to represent that the disclosed credit problems were contained and the balance of the portfolio remained stable, while omitting current borrower-level facts known to, or recklessly disregarded by, the relevant speakers that showed material deterioration in several large credits.

(a) The challenged statements conveyed representations about conditions then existing in FSK's portfolio. Forman expressly cited the 58% reduction in nonaccruals to support an impression of improving "credit quality and overall portfolio stability" and then assured investors that the portfolio continued to demonstrate "strong credit performance." Pietrzak used current nonaccrual rates, interest coverage, investment ratings, and current-Adviser statistics to represent that the disclosed problems remained idiosyncratic, the portfolio continued to demonstrate stability, and the published ratings identified the relevant watchlist risk.

(b) When Forman and Pietrzak spoke on February 27, 2025, the Adviser's borrower financials, liquidity information, and workout materials showed that KBS remained unable to service its replacement debt in cash; 48Forty's lender-supported recapitalization had been driven by liquidity pressure and shifted most of its interest from cash to PIK; and PRG remained burdened by the excessive leverage that had impaired it for years. FSK's reported schedules reflected only some consequences of those conditions – including that both KBS replacement loans were accruing entirely through PIK – but did not disclose the borrower forecasts, liquidity shortfalls, or workout assessments showing the extent and direction of the deterioration.

(c) By May 8, 2025, the deterioration at PRG and 48Forty had become still more pronounced. PRG's preferred equity had declined from approximately $120.7 million at year-end 2023 to approximately $22.3 million, while approximately $420 million of PRG debt remained on accrual and generated nearly $12 million of PIK income during the quarter. Following its November 2024 recapitalization, 48Forty's principal loan had declined from approximately $148.5 million at year-end 2024 to approximately $135.8 million, while its cost increased and it generated approximately $3.8 million of PIK interest but only approximately $1 million of cash interest. Those reported amounts reflected the effects of the deterioration but did not disclose the current liquidity, leverage, and borrower-performance information the Adviser was receiving. Pietrzak nevertheless brushed off FSK's two largest quarterly markdowns to tour cancellations and margin pressure at PRG and labor costs and excess inventory at 48Forty.

(d) By August 7, 2025, Defendants knew that several recently restructured borrowers had not achieved durable recoveries and that FSK's security-level classifications did not capture its full borrower-level exposure. FSK continued to carry KBS's larger first-out loan on accrual at a fair value of approximately $210.7 million even though it generated interest entirely through PIK and continued to carry approximately $235.6 million of other PRG debt on accrual even though PRG remained distressed and heavily dependent on PIK. KBS and Worldwise had both deteriorated after recent restructurings. In addition, on July 24, 2025, Lionbridge's owners and KKR Loan Administration Services, acting for lending entities majority-owned by FSK, had executed a side letter agreeing to implement a restructuring of Lionbridge's debt. Those contemporaneous facts contradicted Pietrzak's representation that the portfolio continued to demonstrate stability and Forman's characterization of the quarter as involving only four company-specific situations.

(e) Pietrzak's answer concerning the watchlist was independently misleading because FSK assigned and reported ratings at the level of individual investments or tranches rather

than the borrower relationship as a whole. A borrower could therefore have one position placed on nonaccrual or subjected to workout supervision while another position remained accruing. By directing investors asking whether additional borrowers were "bubbling up" to the percentage of individual investments assigned ratings of 3 or 4, Pietrzak understated FSK's total exposure to borrowers already experiencing material distress and active workout activity.

(f) When Pietrzak spoke on November 6, 2025, the Adviser possessed direct evidence that the deterioration had spread. On October 23, 2025, Lionbridge's owner entities and KKR Loan Administration Services, acting for lending entities majority-owned by FSK, had executed a Transaction Steps Agreement under which those entities would receive equity and FSK would obtain ultimate indirect sole control of Lionbridge. The transaction contemplated a lender takeover of the distressed borrower rather than repayment of FSK's loan in the ordinary course. DCA had also been marked down for three consecutive quarters, and weakness among healthcare rollups – later admitted by Pietrzak to have been in the Adviser's thinking for the "last handful of quarters" – was already developing. Pietrzak nevertheless invoked the absence of new nonaccruals, "healthy" interest coverage, and the declining current-Adviser nonaccrual rate to portray the portfolio as stable.

(g) Pietrzak's own admissions confirm the omitted facts. On August 7, 2025, he admitted that KBS's problems had been "going on for a period of time," that "PRG would be the same," that PRG's difficulties had continued for an "extended period of time," and that 48Forty was "trending" toward nonpayment. Those admissions corroborate the falsity of the February and May assurances – these were not conditions that first arose suddenly during the second quarter. Pietrzak later admitted that DCA was a 2021 investment made in "a different rate environment" that was "just over levered," and that weakness among healthcare rollups had been emerging in the Adviser's

thinking for the "last handful of quarters," confirming that the relevant conditions existed when he spoke in November.

### B. Defendants Used Restructurings and Security-Level Nonaccrual Classifications to Misrepresent Borrower-Level Improvement

121. Throughout the Class Period, Defendants used reductions in FSK's reported nonaccrual investments to tell investors that the Adviser's workouts had resolved troubled credits, reduced risk, and improved portfolio credit quality. With respect to the borrowers alleged below, the transactions often changed the form or accounting classification of FSK's exposure without producing a comparable cash recovery or restoring sustainable cash performance. Defendants nevertheless paired the lower security-level nonaccrual figures with present-tense claims of "positive results," "resolution," "fundamental derisking," and "significant progress," while the Defendants possessed current borrower financial statements, operating results, liquidity information, internal risk ratings, valuation materials, and workout reports showing that material exposures remained dependent on PIK and the same impaired businesses. Those statements gave investors a materially false impression of what the restructurings had accomplished and how much risk FSK continued to bear.

122. On May 8, 2024, FSK issued a release announcing its 1Q24 results, which FSK furnished as Exhibit 99.1 to a Form 8-K filed that day. In the release, Forman stated that FSK had "made significant progress restructuring certain non-accruing investments."

123. Also on May 8, 2024, FSK filed its Form 10-Q for the quarter ended March 31, 2024, which Forman and Lilly signed and certified. The filing reported that investments on nonaccrual had declined to 6.5% of the portfolio at amortized cost and 4.2% at fair value, from 8.9% and 5.5%, respectively, three months earlier.

124. On May 9, 2024, during FSK's first-quarter earnings call, Forman stated that FSK had made "significant progress with regard to three of the investments placed on nonaccrual" during

the preceding quarter. Pietrzak stated that the workout team had been active on the affected investments and that Defendants were "pleased to have achieved positive results quickly." Pietrzak acknowledged that "there's still work to be done," and he emphasized that Defendants were "clearly" pleased with their recent progress in reducing FSK's non-income-producing and nonaccrual investments.

125. During the same call, Gerson reported that FSK had removed Wittur, KBS, and Sweeping Corporation of America from nonaccrual, eliminating approximately $395 million of cost and $224 million of fair value from reported nonaccruals. Gerson explained that Wittur's second-lien loan had been equitized and KKR had taken control of the business; that KBS had completed a "full consensual restructuring" through which FSK received new first-lien and second-out debt, preferred equity, and an ownership interest; and that Sweeping Corporation of America's debt had been divided among several new tranches. At KBS, the exchange removed approximately $197.6 million of the old nonaccruing loan's cost from reported nonaccruals without a comparable cash repayment; FSK instead continued to hold approximately $315.2 million of funded KBS debt and preferred equity at cost.

126. Gerson characterized those transactions as successful economic resolutions, stating: "The progress we've achieved with regard to these portfolio companies is an example of the benefits of KKR Credit['s] investment platform. Our fundamental derisking approach to these credits was evident in our resolution of non-accruals this quarter."

127. Gerson also reported that, within the portion of FSK's portfolio originated by KKR Credit and the Adviser, nonaccrual investments represented only 2.3% at cost and 1.0% at fair value.

128. On August 6, 2024, FSK issued a release announcing its second-quarter results, which it furnished with a Form 8-K filed that day. Forman stated that "our workout team's efforts further reduced our non-accrual investments." The release reported that nonaccrual investments had

declined to 4.3% at amortized cost and 1.8% at fair value, from 6.5% and 4.2%, respectively, at the end of the preceding quarter. FSK's Form 10-Q filed the same day, signed and certified by Forman and Lilly, reported the same percentages.

129. On August 7, 2024, during FSK's second-quarter earnings call, Pietrzak repeated the reported decline in nonaccruals and stated that, within the 88% of the portfolio originated by KKR Credit and the Adviser, nonaccruals were only 2.4% at cost and 0.6% at fair value. Forman stated that FSK had "made significant progress restructuring certain non-accruing investments."

130. KBS was one of the quarter's principal sources of unrealized depreciation, and FSK had substantially reduced the value of the equity it received in the recent restructuring. Gerson nevertheless said Defendants were "pleased with the progress that KBS is making under our collective ownership" and "optimistic about its future prospects." When an analyst asked how those assurances squared with the approximately 50% reduction in FSK's KBS equity mark, Pietrzak described the mark as "a little bit of a point in time," and said the relevant progress involved "a longer-term game" of stabilizing and growing the business. Gerson likewise said, "the proof" would come "over the longer term," and maintained that Defendants were "bullish on the prospects of this business."

131. On November 6, 2024, FSK issued a release announcing its third-quarter results, which it furnished with a Form 8-K filed that day. Forman stated that FSK had "further reduced our non-accrual investments." The release and FSK's Form 10-Q, signed and certified by Forman and Lilly, reported nonaccrual investments of 3.8% at amortized cost and 1.7% at fair value, compared with 4.3% and 1.8%, respectively, at the end of the preceding quarter.

132. During FSK's November 7, 2024 earnings call, Pietrzak again emphasized that nonaccruals had declined, reporting rates of 3.8% at cost and 1.7% at fair value for the overall portfolio and only 2.2% and 0.5%, respectively, for investments originated by KKR Credit and the

Adviser. Forman closed the call by stating that Defendants were "pleased with FSK's third quarter performance as we have further reduced our non-accrual investments."

133. On February 26, 2025, FSK filed its 2024 Form 10-K, which reported that investments on nonaccrual represented 2.2% of the portfolio at fair value, compared with 5.5% one year earlier.

134. On February 27, 2025, during FSK's fourth-quarter and full-year earnings call, Forman identified improving "credit quality and overall portfolio stability" as FSK's first objective during 2024 and stated that, "[t]o that end," FSK had reduced its nonaccrual investments by 58%. Pietrzak reported nonaccrual investments of 3.7% at cost and 2.2% at fair value, and only 2.0% and 0.8%, respectively, for the KKR- and Adviser-originated portfolio.

135. During the same call, Pietrzak described the restructuring of Worldwise. Pietrzak stated that Worldwise had been restructured during the fourth quarter of 2024, that its sponsor had contributed approximately $42 million of additional capital, that $30 million had been used to repay debt at par, and that KKR-managed funds had obtained a 35% equity interest and three seats on Worldwise's board.

136. On May 7, 2025, FSK filed a Form 8-K furnishing its first-quarter results release and filed its Form 10-Q for the quarter ended March 31, 2025, which Forman and Lilly signed and certified. The release and Form 10-Q reported that nonaccrual investments had declined to 3.5% at cost and 2.1% at fair value.

137. During FSK's May 8, 2025 earnings call, Pietrzak repeated those figures and reported that nonaccruals within the approximately 90% of the portfolio originated by KKR Credit and the Adviser remained at only 2.0% at cost and 1.0% at fair value. Pietrzak explained that Alacrity and Accuride Corporation had been removed from nonaccrual through restructurings, while Miami

Beach had been removed because its remaining subordinated debt was converted into equity as part of its wind-down.

138. On August 6, 2025, FSK filed a Form 8-K furnishing its second-quarter results release and filed its Form 10-Q for the quarter ended June 30, 2025, which Forman and Lilly signed and certified. Those documents disclosed that reported nonaccruals had increased to 5.3% at cost and 3.0% at fair value.

139. On August 7, 2025, during FSK's second-quarter earnings call, Defendants disclosed that selected positions in PRG, 48Forty, KBS, and Worldwise had been placed on nonaccrual. Pietrzak nevertheless said that FSK's portfolio "continue[d] to demonstrate stability," described each of the four situations as "unique to the issuer," and stated that KBS had "successfully focused on new business development, value creation, operational improvements[,] and cost reductions" and that its "performance has stabilized." During the ensuing question-and-answer session, however, Pietrzak acknowledged that KBS's problems had been "going on for a period of time," that PRG's problems had been "ongoing for some extended period of time," and that 48Forty had been placed on nonaccrual while still paying interest because nonpayment was where the credit was "trending." Addressing KBS again, Pietrzak acknowledged that stabilization had "been sort of delayed" and that customer-churn metrics had taken longer to stabilize in a manner satisfactory to the lenders.

140. On November 5, 2025, FSK filed a Form 8-K furnishing its third-quarter results release and filed its Form 10-Q for the quarter ended September 30, 2025, which Forman and Lilly signed and certified. The release and Form 10-Q reported that nonaccrual investments had declined to 5.0% at cost and 2.9% at fair value.

141. On November 6, 2025, during FSK's third-quarter earnings call, Pietrzak stated that FSK's governance and workout team had made "significant progress" on the investments discussed during the prior quarter. Regarding PRG, Pietrzak said that the October restructuring had produced a

"market aligned capital structure" and that FSK and its BDC co-lender would "exercise effective control" of the company. Although he acknowledged that "pricing and industry pressure remains," he said the restructuring had placed PRG "in a much better position to create value going forward." Pietrzak also stated that the 48Forty restructuring was "progressing" and that KBS was "perform[ing] in line with plan" after the workout team had "stabilize[d] the business quite quickly."

142. Pietrzak further stated that no investments had been added to nonaccrual during the third quarter and that New Era Technology had been removed after FSK exchanged its nonaccruing first-lien loan for a new accruing first-lien loan and revolver, preferred stock, and common equity. The transaction removed approximately $29 million of cost and $18 million of fair value from reported nonaccruals, while FSK continued to hold replacement debt and equity issued by the same borrower.

143. Pietrzak then presented a substantially lower pro forma nonaccrual rate based upon the PRG restructuring, stating that, although reported nonaccruals were 5.0% at cost and 2.9% at fair value as of September 30, "Pro Forma for the PRG restructuring, which closed subsequent to quarter end, our nonaccrual rate would be 3.6% on a cost basis and 1.9% on a fair value basis, assuming the remainder of the portfolio is unchanged." The pro forma calculation gave effect to PRG's October exchange and reclassification because it lowered the reported nonaccrual rate, while freezing every other credit at its September 30 classification.

144. The statements alleged in ¶¶122, 124, 126, 134, 141 and 143 were materially false and misleading when made. Defendants did not present the declining nonaccrual figures as mere changes in the accounting treatment of individual securities. They used those changes to represent that troubled credits had been resolved, that the Adviser had reduced FSK's economic risk, and that portfolio credit quality and stability had improved. The following contemporaneous facts, known to or recklessly disregarded by the identified speakers, contradicted those representations:


4933-1013-3459.v1

(a) In May 2024, KBS had not repaid the exposure Defendants claimed to have resolved and de-risked. As alleged in ¶¶30-42 and 49-52, the restructuring removed approximately $197.6 million of the old second-out loan's cost from reported nonaccruals, but FSK received no comparable cash repayment and continued to hold approximately $315.2 million of funded KBS debt and preferred equity at cost. Both replacement loans included cash-pay interest plus substantial PIK components and remained dependent on the same business whose higher interest expense, wage pressure, and customer losses had caused material deterioration. Gerson knew or recklessly disregarded those facts through his positions as FSK's Co-President, FS Investments' Head of Private Credit, and a member of the Adviser's Investment Committee, and he personally explained the restructuring and KKR-managed funds' collective ownership of KBS. Forman simultaneously led FSK, the Adviser, and FS Investments. Their access to KBS's financial information and the restructuring negotiations contradicted their claims of "positive results," "resolution," and "fundamental derisking."

(b) By February 2025, the nonaccrual reduction Forman invoked as proof of improving "credit quality and overall portfolio stability" had not produced a corresponding borrower-level recovery. Both replacement KBS loans were then accruing entirely through PIK; 48Forty's recent lender-supported recapitalization had shifted most of its interest from cash to PIK; and PRG remained burdened by the excessive leverage that had impaired it for years. The Adviser's current borrower financials, liquidity reports, and workout assessments showed that the lower year-end rate reflected restructurings, conversions, write-offs, and security-level classifications—not the broad improvement in borrower credit quality Forman represented. As CEO of both FSK and the Adviser, Forman led the entity that reported the rate and the entity that received the borrower information and managed the workouts underlying it.

(c) The October 2025 PRG restructuring likewise changed the form and classification of FSK's exposure without producing a comparable cash recovery. As alleged in ¶¶74-79, approximately $197.7 million of old PRG loan cost ceased counting as nonaccrual after the exchange, but FSK and its co-lender took effective control of the same distressed borrower. The new PRG loan issued in that completed restructuring accrued interest entirely through PIK, and FSK continued to hold substantial PRG debt and equity. Pietrzak therefore knew or recklessly disregarded that the lower pro forma rate measured the removal and replacement of the old instruments, not a corresponding repayment or economic recovery by PRG.

(d) While Pietrzak disclosed that the pro forma calculation assumed the remainder of the portfolio was unchanged, the calculation was nevertheless misleading because Defendants selectively incorporated PRG's favorable post-quarter reclassification while omitting contemporaneous post-quarter developments showing deterioration. As alleged in ¶¶80-81, on July 24, 2025, Lionbridge's owners and KKR Loan Administration Services LLC, acting for lending entities majority-owned by FSK, executed an agreement to restructure Lionbridge's debt. On October 23 – two weeks before the earnings call – the parties signed a further agreement providing for Lionbridge's parent equity to be transferred to a lender-controlled vehicle through which FSK would obtain ultimate indirect control. That was a lender takeover in place of repayment on the loan's original terms. Yet they continued to carry the approximately $92.7 million Lionbridge loan on accrual at approximately 95% of cost and gave no effect to the signed Lionbridge transaction when presenting a pro forma rate that gave full effect to PRG's restructuring. In other words, Defendants updated the one post-quarter transaction that made FSK's credit statistics look better while omitting another signed restructuring showing that a material borrower was already unable to repay its debt in the ordinary course.

(e) DCA supplied additional current evidence that the rest of the portfolio had deteriorated. As alleged in ¶¶82-83, FSK had marked down the approximately $107 million loan in each of the first three quarters of 2025 while keeping it on accrual. The Adviser was simultaneously monitoring weakness among healthcare rollups – a development Pietrzak later admitted had been an emerging theme for the "last handful of quarters." By year-end, FSK had divided DCA into two tranches, placed both on nonaccrual, designated both as non-income-producing, and reduced their aggregate fair value by approximately $9.5 million in a single quarter. Pietrzak's admissions that DCA was "just over levered" and that the sector weakness had been developing for several quarters confirmed that DCA's deterioration was already underway when Defendants selectively updated their November presentation for PRG.

(f) Pietrzak knew or recklessly disregarded these facts. He served as FSK's CIO and President, a director, a senior officer of the Adviser, a KKR Partner, and KKR's Global Head of Private Credit; oversaw FSK's portfolio; and delivered the borrower-specific workout updates and pro forma calculation at issue. The Adviser and KKR personnel under that structure possessed the signed Lionbridge agreements, PRG's completed restructuring terms, DCA's borrower reporting and successive valuation materials, and the internal ratings and workout reports for the affected investments. Those were the same sources Pietrzak relied upon when claiming "significant progress" and presenting the selectively adjusted nonaccrual rates.

(g) The year-end results confirmed the conditions already reflected in the PRG restructuring terms, the signed Lionbridge agreements, DCA's successive markdowns, and the Adviser's borrower monitoring. Although PRG ceased counting as nonaccrual, positions involving five borrowers entered nonaccrual during the fourth quarter. FSK's overall nonaccrual rate increased to 5.5% of cost and 3.4% of fair value, and the rate for the KKR- and Adviser-originated

portfolio increased to 5.1% and 3.1%, respectively. PRG itself generated approximately $47 million of additional losses after the restructuring Defendants had used to lower the pro forma rate.

(h) These omissions were material because Defendants used reported nonaccruals as a principal measure of portfolio credit quality, the success of the Adviser's workouts, and the supposedly superior performance of KKR- and Adviser-originated investments. The four borrowers added to nonaccrual in 2Q25 involved approximately $500 million of cost and $272 million of fair value and accompanied a 6.2% decline in NAV. The positions involving five borrowers added during the fourth quarter involved another approximately $255 million of cost and $214 million of fair value and accompanied a further 5% decline in NAV. The magnitude of those exposures and their direct effect on FSK's reported asset values and income made the omitted borrower-level conditions material to investors.

## C. Defendants Misrepresented FSK's Current Investment Ratings, Accrual Classifications, and Fair Values

145. FSK had no employees of its own. The Adviser received the borrower information, monitored portfolio performance, assigned internal investment ratings, determined whether investments should remain on accrual, and implemented the valuation process that produced FSK's reported fair values. FSK did not present the resulting ratings, accrual classifications, and fair values as arbitrary labels. In its SEC filings, FSK represented that those reported outputs reflected the Adviser's application of current borrower information to FSK's stated standards concerning performance, collectability, and value. Pietrzak reinforced that representation when he directed investors asking about current watchlist risk to FSK's published ratings.

146. On May 8, 2024, FSK stated in its Form 10-Q that, "[i]n addition to various risk management and monitoring tools," the Adviser used the four-level rating system described in ¶100 "to characterize and monitor the expected level of returns on each investment" in FSK's portfolio. Under the definitions alleged in ¶100, ratings of 1 and 2 denoted performing investments and



4933-1013-3459.v1

communicated specific conclusions about execution against plan, borrower performance, covenant compliance, and repayment of interest and FSK's cost basis. FSK thereby represented that its published ratings reflected the Adviser's current assessment of each investment's performance and expected returns.

147. The May 8, 2024 Form 10-Q also stated that FSK recorded interest income on an accrual basis only "to the extent that it expects to collect such amounts" and did not accrue interest if it had "reason to doubt its ability to collect such income." FSK represented that it placed an investment on nonaccrual "when there is reasonable doubt that interest income will be collected" and restored an investment to accrual only "when principal and interest become current and are likely to remain current based on the Company's judgment." Accordingly, when FSK reported an investment as accruing, it represented that FSK then expected to collect the recorded interest and did not have reasonable doubt concerning collection.

148. The May 8, 2024 Form 10-Q further represented that FSK's Board had designated the Adviser to exercise "day-to-day responsibility for implementing the portfolio valuation process." FSK stated that its valuation process considered, among other things, each portfolio company's current financial information, ability to service debt, expected cash flows, anticipated repayments, collateral values, and other relevant terms. FSK further stated that the Adviser supplied updated quarterly information to independent valuation services and reviewed the resulting valuation inputs for "accuracy, completeness[,] and timeliness." FSK's reported fair values thus represented the Adviser's then-current judgments after considering those borrower-specific factors.

149. FSK repeated materially identical investment-rating definitions, accrual and nonaccrual policies, and valuation representations in its Forms 10-Q filed on August 6 and November 6, 2024, and May 7, August 6, and November 5, 2025, and in its Form 10-K filed on February 26, 2025. In each filing, FSK reported the current investment ratings, fair values, and

accrual or nonaccrual classifications generated through those processes. FSK made the statements in the filings. As did Forman and Lilly, who signed and certified each report, while Pietrzak also signed the Form 10-K as a director.

150. The Adviser's monitoring responsibilities gave it the current borrower-level information that bore directly on the information FSK reported. As FSK acknowledged in its February 26, 2025 Form 10-K, the Adviser received detailed financial and operating reports from portfolio companies, monitored their financial condition, covenant compliance, financial requirements, and execution against business plans, and used that information to conduct "an ongoing, rigorous assessment" of their performance and prospects. The Adviser also maintained FSK's watchlist and participated directly in the restructurings and workouts of troubled borrowers. Weakening cash flows, increasing reliance on PIK, liquidity shortfalls, impending restructurings, and deterioration toward nonpayment were therefore among the facts that FSK's reported ratings, accrual classifications, and fair values were supposed to reflect.

151. FSK used the resulting ratings to report that ratings 1 and 2 – categories FSK defined as performing – comprised approximately 94% of the portfolio at March 31 and June 30, 2024; 95% at September 30 and December 31, 2024; and 93% at March 31, June 30, and September 30, 2025. FSK simultaneously reported the security-level fair values and accrual or nonaccrual classifications generated through the Adviser-controlled processes described above.

152. Pietrzak reinforced the significance of FSK's published ratings during the August 7, 2025 earnings call. When an analyst asked whether investments beyond the four newly disclosed nonaccruals were "bubbling up" on FSK's watchlist, Pietrzak stated that "the simplest thing to point to is kind of the risk ratings" and identified the "roughly [seven]-odd percent of the portfolio" assigned ratings of 3 or 4. Pietrzak thereby directed investors asking about current watchlist risk to the ratings FSK had published the previous day.

153. FSK's representations that its reported investment ratings, accrual classifications, and fair values reflected its stated standards and the current borrower information available to the Adviser were materially false and misleading when made. Pietrzak's August 7, 2025 watchlist response was likewise materially false and misleading. The contemporaneous facts known to Defendants through the Adviser's monitoring, restructuring, and workout activities contradicted the condition those reported outputs conveyed:

(a) By May 2024, the Adviser had participated directly in restructuring KBS after higher interest expense, wage pressure, and customer losses caused what Defendants acknowledged was "material deterioration." The restructuring removed approximately $197.6 million of cost and $135.3 million of fair value from reported nonaccruals without a comparable cash recovery, replaced the distressed instruments with approximately $266.9 million of funded debt and $48.3 million of preferred equity, and left FSK and the other lenders in control of the same troubled business. Both replacement loans contained substantial PIK components. Those facts bore directly on collectability and value, yet FSK placed both replacement loans on accrual and used their assigned values to report an apparent improvement in its portfolio.

(b) The information available to the Adviser continued to diverge from FSK's reported outputs. By year-end 2024, both restructured KBS loans were accruing entirely through PIK. PRG had already undergone a prior restructuring, remained overleveraged, and was experiencing problems that Pietrzak later admitted had continued for "some extended period of time." In November 2024, 48Forty required a lender-supported recapitalization that extended its principal debt and shifted most of its interest from cash to PIK. By March 31, 2025, FSK had marked PRG's preferred equity down to approximately $22.3 million while continuing to carry approximately $420 million of PRG debt on accrual and recognizing nearly $12 million of quarterly PIK income. During the same quarter, 48Forty's principal loan generated approximately $3.8

million of PIK income but only approximately $1 million of cash interest. These were not later-arising conditions. They were current facts bearing directly on the borrowers' performance, ability to pay interest in cash, and the collectability and value of FSK's investments.

(c) By August 2025, FSK had written the KBS preferred equity down to zero and placed the second-out loan on nonaccrual, yet continued accruing entirely noncash interest on the larger first-out loan and valued it above cost. FSK likewise placed selected positions in PRG and 48Forty on nonaccrual while leaving other material exposure to the same distressed borrowers accruing or income-producing. Pietrzak admitted that KBS's problems had been "going on for a period of time," that PRG's problems had been "ongoing for some extended period of time," and that 48Forty was "trending" toward nonpayment before FSK placed it on nonaccrual. These admissions confirmed that the August classifications did not mark the beginning of the deterioration; they marked the point at which FSK could no longer keep all of it outside its reported nonaccruals.

(d) Pietrzak's August 7 statement directing investors to the published ratings was also misleading in light of the current information concerning Lionbridge. On July 24, 2025 – two weeks before Pietrzak answered the watchlist question – Lionbridge's owner entities and KKR Loan Administration Services LLC, acting as agent for lending entities majority-owned by FSK, had executed a Sale and Restructuring Committee Side Letter agreeing to implement a restructuring of Lionbridge's debt. FSK nevertheless carried its Lionbridge loan on accrual at approximately 101% of cost as of June 30, 2025, and Pietrzak did not disclose the agreed restructuring when he directed investors to the published ratings as the simplest measure of additional watchlist risk.

(e) By November 5, 2025, the disparity was even greater. On October 23, 2025, the transaction parties had executed a Transaction Steps Agreement under which 100% of the shares of Lionbridge's parent would be transferred to a new entity, the lenders would receive equity, and FSK would obtain ultimate indirect control of Lionbridge through its majority ownership of the

lending entities. The transaction was a lender takeover in place of repayment in the ordinary course. DCA had meanwhile been marked down in three consecutive quarters, and the Adviser had been tracking weakness among healthcare rollups that Pietrzak later admitted had been an emerging theme for the "last handful of quarters." FSK nevertheless kept Lionbridge and DCA on accrual on September 30 and presented the portfolio other than PRG as unchanged when Pietrzak calculated lower pro forma nonaccrual rates on November 6. Less than two months later, FSK placed both investments on nonaccrual and materially reduced their reported values.

(f) The omitted facts were the same facts FSK represented that its valuation process elucidated and considered. A borrower's inability to service debt fully in cash, increasing dependence on PIK, need for repeated restructuring, deteriorating liquidity, and movement toward lender control directly affected expected cash flows, anticipated repayment, and fair value. FSK's KBS marks further demonstrate the disconnect. On March 31, 2025, FSK valued the preferred equity received in the KBS restructuring at approximately 39.8% of cost and increased its mark, while Ares Capital and BlackRock TCP valued preferred interests received in the same recapitalization at approximately 2.6% and 6.0% of cost, respectively, and reduced their marks. To the extent the reported fair values were opinions, Defendants did not genuinely believe that the challenged values reflected all current information material to the borrowers' ability to pay and the expected recovery on its investments. At a minimum, FSK omitted particular known facts that materially conflicted with what a reasonable investor would understand to be the basis for those values.

(g) FSK made the challenged filing statements and reported the resulting ratings, accrual classifications, and fair values. As did Forman and Lilly, who signed and certified the reports. Forman simultaneously served as CEO of FSK and the Adviser; Lilly oversaw the financial-reporting function through which FSK reported the challenged values, classifications, income, and

fees; and Pietrzak served as FSK's CIO, oversaw its portfolio, signed the 2024 Form 10-K, and personally directed investors to the published ratings as a measure of watchlist risk. Their respective responsibilities gave them direct access to the current borrower information that contradicted their misstatements.

### D. Defendants Misrepresented Whether the Adviser's Compensation Conflict Had Materialized

154. FSK's fee structure gave the KKR and the Adviser a direct financial interest in the investment classifications and values they controlled. Maintaining reported gross assets supported the Adviser's base management fee, while continuing to accrue interest – including PIK that borrowers did not pay in cash – supported its income incentive fee. Gerson and Pietrzak nevertheless represented that the Adviser's restructuring and workout decisions were directed toward maximizing value for FSK's stockholders. In its SEC filings, FSK described the adverse consequences of the compensation structure as risks that merely "could" or "may" occur. Those statements were false and misleading because the conflict had already materialized: the Adviser was using restructurings, partial nonaccrual classifications, continued PIK accruals, and delayed markdowns in a manner that preserved current fees while FSK and its shareholders suffered the resulting losses.

155. On May 9, 2024, Gerson told investors that the completed restructurings demonstrated the benefits of KKR's credit platform, called them evidence of the Adviser's "fundamental derisking approach," and described the removal of the investments from nonaccrual as a "resolution." He stated that the Adviser's prompt action would significantly improve FSK's prospects for "a meaningful or even full recovery" of its investment capital. Addressing KBS specifically, Pietrzak stated that the transaction would "help kind of drive longer term value," emphasized that the workout team had brought "a handful of KKR advisers to bear," and represented that the Adviser would select what it considered "the best" course for the situation. Gerson added

that FSK did not believe in "kicking the can down the road" and instead acted promptly to "maximize[] value for our investors."

156. FSK's May 8, August 6, and November 6, 2024 Forms 10-Q continued to present the relevant Adviser-related risks merely as "Potential Conflicts of Interest." Defendants thus continued to describe the adverse consequences of the compensation structure merely as future hypothetical contingencies. Its Forms 10-Q filed on May 7, August 6, and November 5, 2025 stated that there had been no material change to those risk factors and continued to characterize the conflicts as potential. FSK made the filing statements. As did Forman and Lilly, who signed and certified each report, while Pietrzak also signed the Form 10-K as a director.

157. Gerson's and Pietrzak's representations that the Adviser's restructuring decisions were directed toward maximizing value for FSK's investors, and FSK's representations that the compensation conflict remained a contingent risk, were materially false and misleading when made. The conflict had already affected the Adviser's treatment of distressed investments:

(a) The Adviser's base management fee was calculated by reference to FSK's gross assets, while its income incentive fee was calculated from pre-incentive-fee NII, including accrued PIK and other noncash income. Realized capital losses and unrealized depreciation did not offset the income used to calculate the quarterly incentive fee, and the operative Advisory Agreement contained no total-return lookback during the Class Period. The Adviser also had no obligation to return a fee attributable to income that FSK accrued but never collected. Those publicly disclosed terms explain how the conflict operated: delaying a markdown preserved assets supporting the management fee, while keeping a troubled investment on accrual preserved income supporting the incentive fee.

(b) But that conflict had materialized before Gerson and Pietrzak made the May 2024 statements. The Adviser helped exchange FSK's distressed KBS investment for new debt and

preferred equity, removed approximately $197.6 million of cost and $135.3 million of fair value from reported nonaccruals without a comparable cash repayment, and placed both replacement loans on accrual even though they contained substantial PIK components and recovery remained dependent on the same troubled borrower. KKR-managed funds simultaneously acquired approximately 46% of KBS, and FSK and the other lenders took control of the company. Those choices preserved substantial reported assets and accrued income – and therefore the bases for the Adviser's fees – without eliminating FSK's underlying credit risk.

(c) The conflict continued after Gerson and Pietrzak told investors that the KBS transaction represented "resolution," "derisking," and an effort to maximize value. By year-end 2024, both replacement loans were accruing entirely through PIK. By June 30, 2025, FSK had written the preferred equity down to zero and placed the second-out loan on nonaccrual, yet kept the larger, entirely PIK first-out loan on accrual. At December 31, 2025, FSK still carried that first-out loan at approximately $220.3 million – above its approximately $217.1 million cost – while the borrower paid no cash interest. The Adviser continued receiving current cash compensation calculated by reference to the reported assets and income.

(d) KBS was not an isolated application of the conflict. FSK continued recognizing PIK and preserving reported value on substantial PRG debt after PRG's preferred equity had suffered severe markdowns and the borrower's problems had persisted for an extended period. After 48Forty's lender-supported recapitalization shifted most of its interest from cash to PIK, FSK continued recognizing the resulting noncash income as the loan's value declined. When FSK eventually placed selected PRG and 48Forty positions on nonaccrual, it left other material exposure to the same borrowers accruing or income-producing. Those security-level classifications confined the distress reflected in FSK's reported statistics while preserving reported assets and accrued income from the remaining positions.

(e) The Adviser controlled every judgment through which the conflict operated. Its personnel received borrowers' nonpublic financial information, maintained FSK's watchlist, participated in restructurings, assigned internal ratings, determined or participated in accrual classifications, implemented the valuation process, maintained FSK's financial records, and helped prepare the reports presenting those judgments to investors. KKR Credit supplied investment professionals, workout personnel, and four members of the Adviser's eight-member Investment Committee, while KKR shared in the Adviser's economics through KKR Credit.

(f) Gerson and Pietrzak knew how the challenged decisions affected the Adviser's compensation. Gerson served on the Adviser's Investment Committee and personally presented the KBS restructuring as a resolution that maximized investor value. Pietrzak served simultaneously as FSK's CIO, a senior officer of the Adviser, a KKR Partner, and KKR's Global Head of Private Credit, oversaw FSK's portfolio, and stated that KKR advisers had participated in the KBS workout. Given their participation in or oversight of the restructuring, classification, and valuation decisions, Gerson and Pietrzak did not genuinely believe their unqualified characterizations of the KBS transaction as a resolution and derisking that maximized investor value.

(g) Forman and Lilly likewise knew that the conflict was no longer contingent when they signed and certified FSK's filings. Forman served simultaneously as CEO of FSK, the Adviser, and FS Investments. Lilly oversaw the financial-reporting function through which FSK reported its asset values, accrued income, and Adviser fees. Their responsibilities placed the KBS restructuring, the continued recognition of PIK, the subsequent markdowns, and the resulting fees squarely within the information they received or recklessly disregarded when FSK continued to describe the conflict as merely potential.

(h) By describing the compensation conflict only as a future possibility, FSK concealed that the Adviser had already exercised its control over particular restructurings, accrual

classifications, and valuations in a manner that protected its current compensation at the expense of shareholders. During 2024 and 2025, FSK incurred approximately $725 million in base-management and income-incentive fees payable to the Adviser, and KKR identified FSK as the primary source of recurring fee-related performance revenues in its Credit and Liquid Strategies business.

### E. Defendants Misrepresented the Durability of FSK's Reported Earnings and the Basis for FSK's Distribution Guidance

158. Throughout the Class Period, Defendants used FSK's reported NII and apparent distribution coverage to tell investors that FSK possessed healthy, strong, and durable earnings power. Those statements conveyed that the interest included in NII was reasonably collectible and that FSK's portfolio could continue generating sufficient income to support the distributions Defendants promoted. Where collection was already doubtful, Defendants' continued accrual of interest on troubled loans and tranches overstated NII itself. Even where reported NII followed Defendants' classifications, Defendants misrepresented the quality and durability of those earnings because a material portion consisted of PIK and other noncash interest from troubled borrowers that could not service their obligations fully in cash. Defendants nevertheless represented that FSK fully earned its distributions, portrayed increased PIK as a planned and manageable workout tool, and later issued NII and distribution guidance without disclosing adverse conditions already impairing the income-producing assets on which that guidance depended.

159. On May 8, 2024, FSK reported first-quarter adjusted NII of $0.73 per share. Forman stated: "We believe the long-term earnings power of FSK continues to be healthy, and we have confidence in our ability to continue to reward shareholders with attractive distributions." FSK declared a second-quarter distribution of $0.70 per share, consisting of a $0.64 base distribution and a $0.06 supplemental distribution, together with a previously announced special distribution of $0.05 per share.

160. On May 9, 2024, during FSK's first-quarter earnings call, Forman stated that FSK continued to "fully earn[]" both its base and supplemental distributions, that its long-term earnings power "continues to be strong," and that Defendants had "confidence in our ability to continue to reward shareholders with these attractive distributions."

161. On November 6, 2024, FSK reported third quarter adjusted NII of $0.74 per share. During the following day's earnings call, Forman stated that "FSK's financial and operating results showed continued strength" and that FSK had "again exceeded our earnings guidance and over earned our quarterly base and supplemental distribution." Lilly then disclosed that FSK had recognized $66 million in PIK income during the quarter, approximately 15% of total investment income.

162. Asked why PIK income had increased, Pietrzak stated that approximately half came from "regular way" new business and that the balance came from a handful of borrowers "reinvesting dollars into growth activities" with FSK's support. Gerson acknowledged that restructured borrowers were "underperforming" and sometimes required management changes or additional investment but emphasized that the PIK option was "intentionally structured" to provide flexibility, that FSK approved the borrowers' budgets through its board roles, and that the Adviser was focused on the "ultimate outcome." Taken together, Defendants presented the increased PIK as a planned and closely supervised bridge to growth or recovery. They withheld the borrower-specific facts showing that material credits were relying on PIK because continuing cash-flow stress prevented them from servicing FSK's debt fully in cash.

163. By November 2025, the deterioration disclosed in August had undermined Defendants' prior assurances concerning FSK's earnings power. Defendants responded by presenting investors with a new distribution framework and another set of confident earnings

forecasts. On November 5, FSK reported third-quarter GAAP and adjusted NII of $0.57 per share and announced that it would reset its distribution framework for 2026.

164. On November 6, 2025, Forman stated that FSK expected its total 2026 distributions to produce an annualized yield of approximately 10% of NAV. He stated that FSK expected a quarterly base distribution of approximately $0.45 per share, supplemented by quarterly NII above that amount, and a total first-quarter 2026 distribution of approximately $0.55 per share. Lilly separately guided to fourth-quarter GAAP NII of approximately $0.51 per share and adjusted NII of approximately $0.56 per share.

165. Earlier during the call, when an analyst asked how Defendants had set the base distribution in light of the forward interest-rate curve, Pietrzak stated that Defendants had considered the forward curve and future refinancing requirements and "were pretty deliberate in coming up with that $0.45 estimate." Later, after another analyst asked how resilient the base distribution would be through different economic cycles and interest-rate scenarios, Pietrzak responded: "I don't think we would have said it if we didn't have a degree of confidence" in the variables Defendants had considered. He reiterated that Defendants had evaluated the forward curve and refinancing requirements, stated that they had assumed little benefit from potential upside developments, and directed investors to focus on the total distribution, including Defendants' expectations for the first quarter and full-year 2026.

166. Analysts understood Defendants to be describing a durable distribution framework grounded in their assessment of FSK's current portfolio. Following the call, RBC stated that the $0.45 base distribution "seems to have been set to be sustainable in a variety of macro scenarios" and increased its estimate of FSK's total 2026 distributions from $2.08 to $2.11 per share. Defendants' statements thus caused the market to understand that they had accounted for the

material conditions affecting FSK's income-producing assets when formulating their concrete fourth-quarter NII guidance and expected first-quarter total distribution.

167. The statements alleged in ¶¶159-165 were materially false and misleading when made. Defendants used reported NII, PIK income, and distribution coverage to convey that FSK's income base was durable and that their November 2025 guidance incorporated the material conditions then affecting the portfolio. The contemporaneous facts were materially different:

(a) Defendants' assurances that FSK possessed healthy and strong earnings power and fully earned its distributions conveyed that the interest included in NII was reasonably collectible and that the assets producing that income remained capable of supporting future distributions. When Defendants recognized interest whose collection was doubtful, the resulting NII was itself overstated. And even when the reported arithmetic followed Defendants' classifications, using that NII to claim healthy, strong, and durable earnings concealed that a material portion consisted of noncash interest from distressed borrowers and did not represent sustainable cash-generating performance.

(b) By May 8 and 9, 2024, Defendants knew from the KBS restructuring negotiations, the Adviser's access to KBS's nonpublic financial information, and their continuing governance and monitoring roles that higher interest expense, wage pressure, and customer losses had caused material deterioration at KBS and that the restructuring had not restored sustainable cash performance. The transaction removed approximately $197.6 million of cost and $135.3 million of fair value from reported nonaccruals without a comparable cash repayment, while FSK continued to hold approximately $315.2 million of KBS debt and preferred equity at cost. The replacement loans contained substantial PIK components, and the Adviser's current budgets, cash-flow projections, and liquidity information showed that FSK's continued recognition of income depended upon KBS's unresolved distress. In that context, Forman's statements that FSK's earnings power was healthy

and strong and that it fully earned its distributions materially misrepresented the quality, collectability, and durability of the income included in NII. Forman actually knew those facts through his simultaneous service as CEO of FSK, the Adviser, and FS Investments and his personal presentation of the restructuring as significant progress.

(c) By November 7, 2024, the Adviser's board representation, budget-approval authority, borrower reporting, and workout supervision gave Gerson and Pietrzak current information showing that KBS's reliance on PIK reflected continuing liquidity stress and an unresolved workout, not ordinary growth investment. During the nine months ended September 30, 2024, KBS's two replacement loans generated approximately $14.1 million of PIK income but only approximately $4.1 million of cash interest, while the preferred equity received in the restructuring had fallen from approximately $48.3 million to approximately $15.5 million in fair value. Gerson substituted a generalized acknowledgment that some restructured borrowers were underperforming and a reassuring description of PIK as intentional flexibility for the specific facts showing the severity, expected duration, and doubtful collectability of KBS's dependence on noncash interest. Gerson actually knew or recklessly disregarded those facts through his service on the Adviser's investment committee, his leadership of FS Investments' private-credit business, and the board and budget rights he invoked during the call. Pietrzak actually knew or recklessly disregarded them through his oversight of FSK's portfolio, his senior roles at the Adviser, and his position as KKR's Global Head of Private Credit. They nevertheless portrayed increased PIK as a controlled workout tool while withholding information showing that a material borrower remained unable to service FSK's investment fully in cash.

(d) The November 2025 NII and total-distribution guidance omitted adverse conditions that Defendants already knew were impairing FSK's income-producing assets. By November 6, KKR Loan Administration Services, acting for lenders majority-owned by FSK, had

executed the July 24 side letter and October 23 Transaction Steps Agreement to restructure Lionbridge's debt and transfer its parent to a lender-controlled vehicle. FSK nevertheless continued carrying the Lionbridge loan on accrual at approximately 95% of cost even though the loan was due to mature in December. FSK had also marked DCA down in three consecutive quarters, and the Adviser had been tracking weakness among healthcare rollups for what Pietrzak later admitted was the "last handful of quarters." Those existing conditions directly affected the interest income, NII, and supplemental distribution that FSK could generate. Forman actually knew or recklessly disregarded those facts through his simultaneous leadership of FSK and the Adviser; Pietrzak actually knew or recklessly disregarded them through his oversight of FSK's portfolio and the Adviser's workouts; and Lilly actually knew or recklessly disregarded them through the current-quarter reporting process by which he evaluated FSK's accrual classifications and investment income and then issued precise NII guidance 36 days into the quarter. Their statements nevertheless conveyed that the material existing portfolio conditions had been considered in producing the fourth-quarter NII forecast and the expected first-quarter total distribution.

(e) FSK's year-end results confirmed the consequences of the conditions known in November. Positions involving five borrowers, including Lionbridge and DCA, entered nonaccrual during the fourth quarter. Interest income declined by approximately $29 million, with FSK identifying the new nonaccruals as one cause. FSK then reported fourth-quarter GAAP NII of $0.48 per share and adjusted NII of $0.52 per share, below Lilly's respective guidance of approximately $0.51 and $0.56. FSK declared a total first-quarter distribution of only $0.48 per share, rather than the approximately $0.55 Forman had led investors to expect, and reduced the indicated yield from approximately 10% to approximately 9.2% of NAV. FSK also guided to first quarter adjusted NII of only approximately $0.44 per share.

(f) Defendants used aggregate PIK income and accumulated spillover income to make FSK's reported earnings and distribution capacity appear stronger and more durable than the underlying portfolio warranted. By presenting the aggregate income while concealing the borrower-level conditions producing it, Defendants materially misrepresented both the amount of collectible current earnings and the capacity of FSK's portfolio to generate earnings and distributions in the future.

## F. Defendants Misrepresented FSK's Investment Values, NAV, NII, and Related Financial Results

168. FSK's reported fair values, NAV, and realized and unrealized gains and losses depended on the valuation judgments challenged above. When Defendants failed to incorporate known borrower deterioration into the fair values assigned to troubled investments, FSK understated unrealized depreciation and overstated NAV. FSK's investment income and NII depended on separate accrual judgments. By keeping an obligation on accrual, FSK continued to recognize its stated cash and PIK interest as current income; when collection was reasonably doubtful, that treatment overstated investment income and NII and made those earnings appear more durable than they were. Defendants then used the resulting values, income, and per-share figures to portray FSK's portfolio and earnings as stronger than the borrower information available to the Adviser supported.

169. On May 8, 2024, FSK issued its first-quarter results release and filed its Form 10-Q for the quarter ended March 31, 2024, which Forman and Lilly signed and certified. FSK reported investments at fair value of approximately $14.221 billion, NAV of $24.32 per share, and NII of approximately $212 million, or $0.76 per share. The release reported adjusted NII of $0.73 per share and a total net realized and unrealized loss of $0.14 per share. FSK recognized approximately $35 million of PIK income during the quarter. Those figures included the instruments received through the KBS restructuring. FSK carried two funded replacement loans at approximately $273.3 million

of aggregate fair value against approximately $266.9 million of aggregate amortized cost, together with newly received KBS preferred equity valued at approximately $48.3 million. Neither replacement loan was placed on nonaccrual, and both contained substantial PIK components.

170. On August 6, 2024, FSK issued its second-quarter results release and filed its Form 10-Q for the quarter ended June 30, 2024, which Forman and Lilly signed and certified. FSK reported investments at fair value of approximately $14.087 billion, NAV of $23.95 per share, and quarterly NII of approximately $215 million, or $0.77 per share. The release reported adjusted NII of $0.75 per share and a net realized and unrealized loss of $0.39 per share. FSK recognized approximately $43 million of PIK income during the quarter. The quarter-end schedules showed that FSK had reduced the KBS preferred-equity mark from approximately $48.3 million to approximately $25.2 million. Yet FSK kept both principal replacement loans on accrual and valued them at approximately $275.8 million in the aggregate – above their approximately $269.7 million aggregate amortized cost – even though KBS was one of the quarter's principal sources of unrealized depreciation.

171. On November 6, 2024, FSK issued its third-quarter results release and filed its Form 10-Q for the quarter ended September 30, 2024, which Forman and Lilly signed and certified. FSK reported investments at fair value of approximately $13.943 billion, NAV of $23.82 per share, and quarterly NII of approximately $215 million, or $0.77 per share. The release reported adjusted NII of $0.74 per share and a net realized and unrealized loss of $0.20 per share. FSK recognized approximately $66 million of PIK income during the quarter. Those results continued to include both restructured KBS loans on accrual even as their interest increasingly shifted from cash to PIK. During the nine months ended September 30, 2024, those loans generated approximately $14.1 million of PIK income but only approximately $4.1 million of cash interest.

172. On February 26, 2025, FSK issued its fourth-quarter results release and filed its Form 10-K for the year ended December 31, 2024. FSK reported investments at fair value of approximately $13.490 billion and NAV of $23.64 per share. FSK reported fourth-quarter GAAP NII of $0.61 per share and adjusted NII of $0.66 per share, and full-year GAAP NII of approximately $813 million, or $2.90 per share, and adjusted NII of $2.88 per share. FSK recognized approximately $211 million of PIK income during 2024, equal to approximately 12.2% of total investment income, and reported approximately $228 million of total net realized and unrealized losses. The year-end schedules showed both restructured KBS loans were accruing entirely through PIK, while FSK carried the related preferred equity at only approximately $15.1 million against approximately $48.3 million of cost. They also showed Worldwise's principal new loan, issued through its fourth-quarter restructuring, at approximately par and accruing entirely through PIK, and 48Forty's principal loan at approximately $148.5 million following a recapitalization that extended its maturity and shifted most of its interest from cash to PIK.

173. On May 7, 2025, FSK issued its first-quarter results release and filed its Form 10-Q for the quarter ended March 31, 2025, which Forman and Lilly signed and certified. FSK reported investments at fair value of approximately $14.122 billion, NAV of $23.37 per share, and quarterly NII of approximately $187 million, or $0.67 per share. The release reported adjusted NII of $0.65 per share and a net realized and unrealized loss of $0.24 per share. FSK recognized approximately $62 million of PIK income during the quarter. Those results included two KBS loans that continued accruing entirely through PIK. FSK also increased its KBS preferred-equity mark to approximately 39.8% of cost, while Ares Capital and BlackRock TCP valued preferred interests received in the same recapitalization at approximately 2.6% and 6.0% of cost, respectively, and both reduced their marks. FSK also kept approximately $420 million of PRG debt on accrual and recognized nearly $12 million of PIK income from PRG during the quarter. Following its November 2024

recapitalization, 48Forty's principal first-lien position generated approximately $3.8 million of PIK income but only approximately $1 million of cash interest during the quarter.

174. On August 6, 2025, FSK issued its second-quarter results release and filed its Form 10-Q for the quarter ended June 30, 2025, which Forman and Lilly signed and certified. Those disclosures revealed part of the accumulated deterioration through a 6.2% decline in NAV and substantial markdowns involving PRG, 48Forty, KBS, and Worldwise. FSK nevertheless continued to report investments at fair value of approximately $13.648 billion, NAV of $21.93 per share, and quarterly NII of approximately $173 million, or $0.62 per share. The release reported adjusted NII of $0.60 per share and a net realized and unrealized loss of $1.36 per share. FSK recognized approximately $53 million of PIK income during the quarter. Those figures continued to include KBS's larger first-out loan on accrual at approximately $210.7 million of fair value against approximately $207.1 million of cost, while its interest accrued entirely through PIK. They also included approximately $235.6 million of other PRG debt that remained on accrual and was valued at approximately $243.5 million, even though those obligations remained heavily dependent on PIK and Defendants had placed other positions of the same borrowers on nonaccrual and marked their related equity to zero.

175. On November 5, 2025, FSK issued its third-quarter results release and filed its Form 10-Q for the quarter ended September 30, 2025, which Forman and Lilly signed and certified. FSK reported investments at fair value of approximately $13.415 billion, NAV of $21.99 per share, and quarterly NII of approximately $159 million, or $0.57 per share. FSK reported adjusted NII of $0.57 per share and a net realized and unrealized gain of $0.19 per share. FSK recognized approximately $54 million of PIK income during the quarter. Those figures included FSK's first-lien Lionbridge loan on accrual at approximately $88.3 million of fair value against approximately $92.7 million of cost, even though KKR Loan Administration Services, acting for lending entities majority-owned by

FSK, had executed a July 24, 2025 agreement to restructure Lionbridge's debt. Before FSK issued the results, the transaction parties had also executed an October 23 agreement providing for the lenders to receive equity and for FSK to obtain ultimate indirect control of Lionbridge. FSK also kept DCA on accrual at approximately $102.9 million of fair value after marking the investment down in each of the first three quarters of 2025.

176. Each of the Forms 10-Q identified above contained certifications signed by Forman and Lilly stating that, based on each officer's knowledge, the filing did not contain a materially untrue statement or omit a material fact necessary to make its statements not misleading, and that the financial statements and other financial information "fairly present[ed] in all material respects" FSK's financial condition and results of operations. Forman and Lilly made materially identical certifications in the 2024 Form 10-K. Forman and Lilly also certified that they had designed, or supervised the design of, disclosure controls intended to ensure that material information concerning FSK, including information known to others performing functions for FSK, was made known to them during preparation of the reports, and that they had evaluated the effectiveness of those controls as of quarter-end. The specific fair values, accrual classifications, PIK and other investment income, NII, NAV, and Adviser fees identified in ¶¶169-175 were all reported through those controls.

177. The statements and certifications alleged in ¶¶169-176 were materially false and misleading when made. The true facts, which were then known to, or recklessly disregarded by, Defendants were:

(a) FSK's reported fair values conveyed that the Adviser had incorporated each borrower's current financial condition, expected cash flows, liquidity, capital structure, and restructuring prospects into its valuation of the investment. Through its monitoring, governance, and workout functions, the Adviser received borrower financial statements, liquidity reports, payment

information, budgets, forecasts, covenant data, and restructuring terms bearing directly on those values. For the investments identified below, that information materially conflicted with the fair values Defendants reported. By delaying markdowns, Defendants understated unrealized depreciation and overstated FSK's NAV.

(b) Keeping an obligation on accrual represented that collection of the recorded interest remained reasonably expected. The challenged borrowers' inability to service their obligations fully in cash, their dependence on PIK, their repeated restructurings, and the Adviser's active workout involvement showed that collection was reasonably doubtful. Defendants nevertheless continued recognizing PIK and other stated interest as current income. Because adjusted NII did not remove that income, Defendants also misrepresented FSK's ongoing results and trends. Defendants' aggregate disclosure of total PIK income obscured which material borrowers could no longer pay cash and concealed that the Adviser's current borrower information showed collection of the reported income was doubtful.

(c) The March 31, 2025 results did not reflect fair value either. FSK increased its KBS preferred-equity mark to approximately 39.8% of cost, while Ares Capital and BlackRock TCP valued preferred interests received through the same recapitalization at approximately 2.6% and 6.0% of cost, respectively, and both reduced their marks. Those independent valuations corroborated that FSK's mark materially overstated fair value. The divergence was not isolated. Both KBS loans accrued entirely through PIK after the restructuring had failed to restore cash performance. PRG's preferred equity had fallen to approximately $22.3 million while approximately $420 million of PRG debt remained on accrual and generated nearly $12 million of PIK income. And after a liquidity-driven recapitalization, 48Forty's principal loan generated approximately $3.8 million of PIK income but only approximately $1 million of cash interest. The

Adviser's borrower-level information showed persistent cash stress that materially conflicted with the values, collectability, and quality of income Defendants reported.

(d) The June 30, 2025 markdowns corrected only part of the misstatement. Defendants marked KBS's preferred equity to zero and placed its impaired second-out loan on nonaccrual, but left the larger first-out loan on accrual, valued it above cost, and continued recognizing its interest entirely through PIK. Defendants likewise marked PRG's preferred equity to zero and placed selected last-out positions on nonaccrual, while keeping approximately $235.6 million of other PRG debt on accrual at approximately $243.5 million of fair value. The differing priorities of the tranches did not eliminate their dependence on the same distressed borrowers or erase the borrower-level conditions known to the Adviser.

(e) The September 30, 2025 results omitted equally concrete evidence concerning Lionbridge and DCA. Before quarter-end, KKR Loan Administration Services had executed a written framework to restructure Lionbridge's debt on behalf of lenders majority-owned by FSK. Before FSK issued its results, the parties had executed the transaction steps through which the lenders would receive equity and FSK would obtain indirect control of Lionbridge – a lender takeover in place of repayment on the loan's original terms. Defendants nevertheless carried the loan on accrual at approximately 95% of cost. DCA had been marked down in three consecutive quarters while remaining on accrual, and the Adviser had been tracking weakness among healthcare rollups for several quarters. Those conditions materially conflicted with the Lionbridge and DCA values and accrual classifications Defendants reported in November.

(f) The challenged fair values conveyed both embedded facts and the Adviser's genuine valuation beliefs. They represented that the Adviser had incorporated current borrower information, applied the valuation factors Defendants identified, and genuinely concluded that the reported figures represented fair value. In fact, Defendants did not genuinely believe that the

challenged values reflected the investments' actual condition, and its nonpublic information, workout involvement, control rights, and the contemporaneous third-party KBS marks materially conflicted with what investors reasonably understood those values to represent.

(g) Forman and Lilly certified figures produced through reporting controls that encompassed the challenged valuation and accrual judgments. Forman simultaneously led FSK and the Adviser, which possessed the borrower information, conducted the workouts, and implemented the valuation process. Lilly, as FSK's CFO and principal financial officer, oversaw the reporting function through which FSK reported its fair values, PIK and other investment income, NII, NAV, and Adviser fees. Their certifications that the filings fairly presented FSK's financial condition and results were false for the same reasons as the underlying figures.

178. The subsequent disclosures confirmed the consequences of conditions already present. In August 2025, the affected PRG, 48Forty, KBS, and Worldwise positions entered nonaccrual with approximately $500 million of cost but only approximately $272 million of reported fair value, after losing approximately $193 million of fair value during the quarter. Pietrzak admitted that the problems at PRG and KBS had persisted for extended periods and that 48Forty had been trending toward nonpayment. At year-end, positions involving five borrowers entered nonaccrual, NAV declined another 5%, and Lionbridge and DCA became principal sources of deterioration. The misstatements were material because analysts expressly used FSK's reported NAV as a principal valuation input: Oppenheimer's May 2024 price target reflected 90% of book value, RBC's May 2024 target applied 0.82 times projected NAV, and Jefferies' July 2024 target approximated one times NAV.

## VI. LOSS CAUSATION

179. During the Class Period, Defendants' materially false and misleading statements, omissions, and deceptive conduct artificially inflated and maintained the price of FSK common

stock by concealing the true deterioration of FSK's investments, overstating their value and collectability, understating nonaccruals, recognizing income that troubled borrowers were not paying in cash, and creating the false impression that FSK's net investment income and shareholder distributions were durable. When the relevant truth was revealed, including through the disclosures below, artificial inflation was removed from FSK's stock price, causing Lead Plaintiff and the Class to suffer economic losses.

180. On August 6, 2025, after the market closed, FSK announced its second-quarter results, and Defendants discussed those results with investors the following morning. Defendants disclosed that FSK's NAV had declined from $23.37 to $21.93 per share, that selected positions involving four additional borrowers had entered nonaccrual, and that nonaccruals had increased from 3.5% to 5.3% of portfolio cost. Defendants disclosed substantial markdowns involving PRG, KBS, 48Forty, and Worldwise, whose relevant positions had lost approximately $193 million of reported fair value during the quarter, and reported net investment income below management's guidance. On the August 7 call, Pietrzak admitted that PRG's problems had been ongoing for an "extended period," that KBS's problems had also persisted, and that FSK placed 48Forty on nonaccrual because nonpayment was where the investment was "trending." Those admissions revealed that the quarter's markdowns and nonaccruals reflected conditions that had developed before the August disclosures. These disclosures partially revealed that the deterioration in FSK's portfolio was materially greater than Defendants had previously represented and that FSK's prior valuations, accrual classifications, reported income, and portfolio-quality metrics had not fairly reflected the condition of these borrowers.

181. On this news, FSK's stock price fell $1.66 per share, or approximately 8.2%, from $20.24 on August 6 to $18.58 on August 7, 2025, on trading volume of approximately 7.7 million shares – more than six times its recent average. The Standard & Poor's 500 ("S&P 500") was

essentially unchanged that day, and the broader business-development-company market declined by less than 1%, supporting the inference that the FSK's decline resulted from Company-specific information. Analysts immediately incorporated the newly disclosed credit deterioration into their earnings and valuation estimates. J.P. Morgan reduced its 2025 and 2026 adjusted-NII estimates from $2.51 and $2.45 per share to $2.39 and $2.24, respectively, "as a function of new non-accruals and a tighter spread environment," lowered its projected year-end 2025 NAV from $23.03 to $21.61 per share, and cut its price target from $19 to $18. Truist likewise reduced its 2025 and 2026 adjusted-NII estimates from $2.47 and $2.43 per share to $2.34 and $2.15, respectively, and cut its price target from $21 to $19, explaining that elevated nonaccruals would continue to weigh on FSK's results. FSK's stock nevertheless remained artificially inflated because Defendants continued to portray the portfolio as stable, described the disclosed problems as manageable, and insisted that investments originated by the current Adviser were performing materially better than FSK's legacy investments.

182. Defendants sought to retain the remaining inflation during the following months. Among other things, they represented that KBS had stabilized and was performing according to plan and emphasized that the restructuring of PRG had reduced FSK's reported nonaccrual rate. Those assurances concealed that significant deterioration remained in loans originated or managed by the current Adviser and that restructurings, PIK accruals, and security-level classifications had postponed or obscured the effect of continuing borrower distress on FSK's income and distributions.

183. On February 25, 2026, after the market closed, FSK reported another decline in NAV and another earnings miss, disclosed that positions involving five additional borrowers had been placed on nonaccrual during the quarter, representing approximately $255 million of cost, and declared a first-quarter distribution of only $0.48 per share – $0.07 below Defendants' November assurances to investors. Even after PRG's removal, FSK's overall nonaccrual rate rose to 5.5% of

cost and 3.4% of fair value – well above both the September rates and the 3.6% and 1.9% pro forma rates Defendants had emphasized in November. Nonaccruals among current-Adviser investments likewise jumped from 3.4% to 5.1% of cost and from 1.8% to 3.1% of fair value. On the February 26 call, Pietrzak acknowledged that FSK's "recent underperformance" reflected challenges not only in PRG, but also in current-Adviser-originated investments including KBS and 48Forty – the same borrowers Defendants had described in November as stabilizing or progressing. Management identified DCA and Lionbridge as the principal new nonaccruals and acknowledged that the increase in nonaccruals would reduce FSK's net investment income and temper its near- and intermediate-term distribution outlook. Pietrzak admitted that DCA was overleveraged, that weakness among healthcare rollups had been in the Adviser's thinking for the "last handful of quarters," and that FSK's active sales process for Lionbridge had been made difficult by direct AI-related pressure on the business. Those admissions confirmed that DCA's overleverage and Lionbridge's restructuring and sales process reflected deterioration already underway when Defendants presented their November portfolio and distribution outlook. These disclosures revealed that the credit problems were not confined to legacy assets or isolated borrowers, but had spread through the current-Adviser portfolio and impaired the recurring income supporting FSK's shareholder distributions.

184. On this news, FSK's stock price fell $2.03 per share, or approximately 15.2%, from $13.32 on February 25 to $11.29 on February 26, 2026, on trading volume of approximately 18.7 million shares – more than six times its recent average. By comparison, the S&P 500 declined approximately 0.6%, and the broader business-development-company market declined approximately 1.8%. The analyst revisions that followed confirmed that the newly disclosed extent of FSK's credit deterioration materially reduced expectations for its future income and value. In a first-look report issued after the earnings release but before the call, Jefferies stated that FSK's "underlying portfolio performance appears stable" and maintained its $22 price target. After the

call, however, Jefferies cited a "shift in credit trends," reduced its 2026 earnings estimate by 18%, and cut its price target to $17. The following morning, RBC attributed FSK's approximately 15% decline "mainly" to management's reduced distribution outlook and a tempered NII outlook resulting from increased nonaccruals. RBC reduced its 2026 adjusted-NII estimate from $2.12 to $1.77 per share, its 2026 distribution estimate from $2.11 to $1.83 per share, and its projected NAV from $21.86 to $20.82, and cut its price target from $17 to $15.

185. The timing, magnitude, and market-adjusted character of the August 2025 and February 2026 declines support the inference that Defendants' fraud was a direct and substantial cause of the Class's losses. The disclosed markdowns, nonaccruals, earnings shortfalls, and reduced distribution outlook revealed the deterioration Defendants had concealed and materialized the very credit and income risks their misstatements had hidden. As the relevant truth emerged, the artificial inflation maintained by Defendants' misrepresentations, omissions, and deceptive conduct was removed from FSK's stock price, causing substantial economic loss to Lead Plaintiff and the other members of the Class.

## VII. CLASS ACTION ALLEGATIONS

186. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased FSK common stock during the Class Period and were harmed thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

187. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, FSK shares were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes

that there are thousands of members in the proposed Class, if not more. Record owners and other members of the Class may be identified from records maintained by FSK, its transfer agent, or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

188. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

189. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

190. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business and operations of FSK;

(c) whether the price of FSK common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

191. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. FRAUD ON THE MARKET

192. Because of Defendants' scheme and pervasive Class Period omissions, a class-wide presumption of reliance is appropriate pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

193. Plaintiff's claims for securities fraud are also asserted, in part, under the fraud-on-the market theory of reliance. The market price of FSK common stock was artificially inflated by the scheme and the materially false and misleading statements and omissions complained of herein. Defendants' scheme and materially false and misleading statements and omissions inflated the price of FSK common stock during the Class Period.

194. The Class Period inflation in the price of FSK common stock was eliminated when the financial conditions, business risks, and other information concealed by Defendants' fraud was revealed to the market. The information did not reach the market all at once but leaked out through several partial disclosures, each of which partially corrected the market price of FSK common stock.

195. At all relevant times, the market for FSK common stock was an efficient market for the following reasons, among others:

(a) FSK common stock met the requirements for listing, and were listed and actively traded, on the NYSE, a highly efficient and automated market;

(b) During the Class Period, a high volume of FSK common stock traded on the NYSE;

(c) As a regulated issuer, FSK filed periodic public reports with the SEC and NYSE;

(d) FSK regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other Internet sites, and other wide-ranging public disclosures, such as conference calls, communications with the financial press, and other similar reporting services;

(e) During the Class Period, FSK was followed by securities analysts employed by major brokerage firms. Analysts employed by these and other firms regularly wrote reports based on the publicly available information disseminated by Defendants about FSK. These reports were distributed to the sales force and certain customers of their respective brokerage firms; and

(f) FSK had substantial institutional ownership during the Class Period. These institutions regularly analyzed and reported on the publicly available information about FSK and its operations.

196. Through the foregoing mechanisms, the information publicly disseminated by Defendants about FSK and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace, such that, as a result of their transactions in FSK stock, the information disseminated by Defendants, including the scheme and materially false and misleading statements and omissions described above, became incorporated into and were reflected by the market price of FSK publicly traded securities.

197. Under these circumstances, all purchasers of FSK common stock during the Class Period suffered similar injury through their purchase of FSK common stock at artificially inflated prices and their subsequent decline in value, and a presumption of reliance applies.

## IX. CLAIMS FOR RELIEF

### COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 (Against All Defendants)

198. Plaintiff incorporates ¶¶1-197 by reference.

199. During the Class Period, Defendants disseminated or approved the statements as specified above in §V, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

200. Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of FSK common stock during the Class Period.

201. Defendants, individually and together, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about FSK's business, operations, and financial condition as specified herein.

202. Defendants had knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

203. As a result of the scheme and dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of FSK

common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of FSK common stock was artificially inflated, and relying directly or indirectly on the materially false and misleading statements, or upon the integrity of the market in which FSK common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants (but not disclosed in Defendants' public statements during the Class Period), Lead Plaintiff and the other Class members purchased or otherwise acquired FSK common stock during the Class Period at artificially high prices and were damaged thereby.

204. Lead Plaintiff and the Class, in reliance on the integrity of the market, paid artificially inflated prices for FSK common stock, and suffered losses when the relevant truth was revealed. Lead Plaintiff and the Class would not have purchased FSK common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' scheme and materially misleading statements and omissions.

205. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in FSK common stock.

206. By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act (Against All Defendants Other Than FSK)

207. Lead Plaintiff incorporates ¶¶1-206 by reference.

208. Lead Plaintiff brings this Count against the Adviser, FS Investments, KKR Credit, KKR, Forman, Pietrzak, Gerson, and Lilly (collectively, the "Control Defendants"), in addition to and, where appropriate, in the alternative to their liability as primary violators under §10(b) and Rule 10b-5.

209. FSK had no employees of its own. It depended on the Adviser and personnel supplied by the Adviser's owners and affiliates to perform the work that a self-managed company ordinarily would have performed for itself. Those entities and individuals did not merely advise FSK from the outside. Through contractual authority, ownership and governance rights, and overlapping management positions, they ran the functions at the center of this case – including the origination, monitoring, restructuring, valuation, accounting, and public reporting of FSK's investments and financial results.

210. Each Control Defendant independently possessed and exercised, directly or indirectly, the power to direct or cause the direction of FSK's management and policies. That extended to the matters conduct and statements at issue here: how troubled investments were monitored and restructured; how internal ratings, accrual status, and fair value were determined; and how those judgments were reflected in FSK's investment income, NAV, incentive fees, SEC filings, and public statements.

211. FS/KKR exercised direct control over FSK through the investment advisory and administrative functions FSK delegated to it. Subject to the Board's oversight, FS/KKR managed FSK's investment portfolio and day-to-day operations. Among other things, FS/KKR sourced and evaluated investments, monitored borrower performance, assigned internal investment ratings, maintained watchlists, managed troubled credits and restructurings, and determined the quarterly fair value of FSK's investments in its capacity as valuation designee. FS/KKR also maintained FSK's books and records, provided accounting and administrative services, assisted in calculating NAV, and prepared or assisted in preparing FSK's SEC filings and shareholder reports. Although FSK's Board retained ultimate oversight, FS/KKR and the personnel it supplied performed this work and made the underlying day-to-day judgments.

212. FS Investments controlled FSK through its affiliate FSJV Holdco's joint operation of the Adviser, FS Investments' appointment of four members of the Adviser's eight-member Investment Committee, and the FS Investments personnel placed in senior positions at FSK and the Adviser. Acting through its affiliate FSJV Holdco, FS Investments held an ownership interest in FS/KKR and participated with KKR Credit in operating the Adviser. FS Investments also supplied representatives to the Adviser's Investment Committee and personnel who performed management and administrative functions for FSK. The overlap extended to the highest levels: Forman simultaneously served as Chairman and CEO of FS Investments, Chairman and CEO of FS/KKR, and Chairman and CEO of FSK; Gerson served as FS Investments' Head of Private Credit, FSK's Co-President, and a member of the Adviser's Investment Committee; and Lilly served as an FS Investments Managing Director and FSK's CFO. Through its ownership and operating role in the Adviser and these overlapping management positions, FS Investments possessed the power to, and did, cause the direction of FSK's management and policies, including the misconduct alleged herein.

213. KKR Credit likewise controlled FSK through its joint operation of the Adviser. KKR Credit appointed four of the eight members of the Adviser's Investment Committee, which approved new and follow-on investments and oversaw the management of FSK's portfolio. KKR Credit also supplied investment professionals, portfolio managers, systems, and other resources used to originate, underwrite, monitor, value, and restructure FSK's investments. Through its ownership interest, its representation on the Investment Committee, and the personnel and resources through which the Adviser performed its responsibilities, KKR Credit shared the power to, and did, direct FSK's investment and portfolio-management policies, including the misconduct alleged herein.

214. KKR controlled FSK through KKR Credit and through KKR personnel who held operational positions at FSK and within the FS/KKR platform. KKR owned and controlled KKR Credit, the entity through which KKR participated in the ownership and operation of the Adviser. At

the same time, senior KKR private-credit personnel occupied positions from which they directed FSK's affairs. Pietrzak was a KKR Partner and Global Head of Private Credit while serving as FSK's CIO, President or Co-President, and a director. Ryan Wilson was a KKR Managing Director and Chief Operating Officer of KKR Private Credit while serving as FSK's Co-Chief Operating Officer. Rony Ma was a KKR Managing Director and private-credit portfolio manager while serving as an FSK officer and a member of the FS/KKR BDC platform's Investment Committee. FSK and its Adviser also relied on KKR's broader investment platform, personnel, and systems to perform their investment-management functions. Through its control of KKR Credit and the KKR personnel operating across FSK and the FS/KKR platform, KKR possessed the power to, and did, cause the direction of FSK's management and policies, including the misconduct alleged herein.

215. Forman controlled FSK from both sides of its externally managed structure. Throughout the Class Period, he simultaneously served as FSK's CEO and Chairman, FS/KKR's CEO and Chairman, and FS Investments' CEO and Chairman. He therefore stood at the head of FSK, its external manager, and one of the entities that owned and operated that manager. FSK itself told shareholders that Forman had "the most knowledge" of FSK's business and strategy and was "best situated" to serve as Chairman. Forman signed and certified FSK's SEC filings, led its earnings calls, and personally made statements concerning FSK's credit performance, internal ratings, restructurings, nonaccruals, investment income, and NAV. His combined authority over FSK and the Adviser gave him the power to direct FSK's management, investment policies, and public reporting, which he did, including the misconduct alleged herein.

216. Pietrzak controlled FSK through his authority over its investment portfolio and his simultaneous leadership roles at FSK and KKR. Throughout the Class Period, Pietrzak served as FSK's CIO and a director. He served as Co-President until June 2025 and as President thereafter. At the same time, he was a KKR Partner, KKR's Global Head of Private Credit, a member of KKR

Credit, and a portfolio manager responsible for FSK. In those roles, Pietrzak oversaw FSK's portfolio and spoke for the Company concerning borrower performance, internal ratings, nonaccrual decisions, restructurings, and valuations. Those responsibilities placed him in direct control of the investment judgments, portfolio-management policies, and misconduct at issue in this case.

217. Gerson controlled FSK from the beginning of the Class Period through at least February 2, 2025, before his sudden leave of absence began. During that period, he simultaneously served as FSK's Co-President, FS Investments' Head of Private Credit, and a member of the Adviser's Investment Committee. He therefore participated in both FSK's executive management and the committee through which the Adviser approved investments and managed FSK's portfolio. Gerson also spoke publicly for FSK concerning nonaccruals, troubled credits, restructurings, and investments originated or managed through the FS/KKR platform. Through these positions, he possessed the power to, and did, direct FSK's management and investment policies during the period alleged, including the misconduct alleged herein.

218. Lilly's control was concentrated in FSK's financial reporting, investor-relations, and capital-markets functions, but those functions directly encompassed the conduct and statements challenged here. Throughout the Class Period, Lilly served as FSK's CFO and principal financial officer while also serving as a Managing Director of FS Investments. When announcing his appointment, FS Investments stated that Lilly would help "strategically lead" FSK and oversee its finance, investor-relations, and capital-markets functions. Lilly signed and certified FSK's periodic reports and was responsible for the financial reporting through which investment values, accrual classifications, investment income, NAV, and incentive fees were presented to investors. On FSK's earnings calls, he personally presented and discussed FSK's financial results, portfolio fair values, investment income, and NAV. Lilly therefore possessed the power to, and did, direct FSK's financial reporting and the public disclosure of the portfolio judgments at issue.

219. As alleged in Count I, FSK committed primary violations of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

220. As alleged throughout the Complaint, each Control Defendant was a culpable participant in FSK's violations.

221. By reason of the foregoing, each Control Defendant is liable under §20(a), jointly and severally with and to the same extent as FSK, for the damages caused by FSK's violations of §10(b) and Rule 10b-5.

222. As a direct and proximate result of the Control Defendants' conduct, Plaintiff and the Class suffered the damages alleged herein.

## X. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of himself and the Class, respectfully requests that the Court issue relief and judgment as follows:

A. Determining that this action is a proper class action and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## XI. JURY DEMAND

Lead Plaintiff hereby demands a trial by jury

DATED: September 28, 2026

SAXTON & STUMP, LLC
LAWRENCE F. STENGEL (P.A. Bar # 32809)

s/ Lawrence F. Stengel

LAWRENCE F. STENGEL

280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Telephone: 717/556-1000
lfs@saxtonstump.com

Local Counsel

ROBBINS GELLER RUDMAN
& DOWD LLP
CHRISTOPHER M. WOOD (admitted *pro hac vice*)
200 31st Avenue North
Nashville, TN 37203
Telephone: 615/244-2203
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
CRISTELLE RABBAN (admitted *pro hac vice*)
420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: 212/432-5100
crabban@rgrdlaw.com

Lead Counsel for Lead Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on September 28, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

DATED: September 28, 2026

SAXTON & STUMP, LLC
LAWRENCE F. STENGEL (P.A. Bar # 32809)

s/ Lawrence F. Stengel
LAWRENCE F. STENGEL

280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Telephone: 717/556-1000
lfs@saxtonstump.com

# Mailing Information for a Case 2:26-cv-02969-CFK STUART v. FS KKR CAPITAL CORP. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lee Albert**
  Lalbert@glancylaw.com,lee-albert-5832@ecf.pacerpro.com,info@glancylaw.com
- **MICHAEL D. DONOVAN**
  mdonovan@donovanlitigationgroup.com
- **PHILLIP C. KIM**
  philkim@rosenlegal.com,pkrosenlaw@ecf.courtdrive.com
- **DAVID M. KLAUDER**
  dklauder@bk-legal.com
- **Cristelle Rena Rabban**
  crabban@rgrdlaw.com
- **Ronald & Pamela Nelson Family Revocable Trust**
  Allen-arneyj@pomlaw.com
- **LAWRENCE F. STENGEL**
  lfs@saxtonstump.com,cag@saxtonstump.com
- **Brian L. Saunders**
  briansaunders@quinnemanuel.com,fskteam@quinnemanuel.com
- **Olivia Simkins**
  osimkins@rosenlegal.com,osimkins@ecf.courtdrive.com
- **Christopher Martin Wood**
  cwood@rgrdlaw.com,erinj@rgrdlaw.com,mgray@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`